**Arthur Lee WILLIAMS, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 69147.**

Court of Criminal Appeals of Texas, En Banc.

Oct. 10, 1984.

Rehearing Denied Jan. 23, 1985.

James Stafford, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., Timothy G. Taft, Keno Henderson, Andy Tobias and Charley Davidson, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ODOM, Judge.

Appellant was convicted of capital murder; the punishment in this case is death. Appellant raises eleven grounds of error. Six relate to jury selection, two address rulings on the admissibility of evidence, two complain of jury argument, and one challenges the sufficiency of the evidence.

■ We first address the six grounds of error relating to the jury selection process. In three of these appellant complains of the trial court excluding prospective jurors on the state's challenge for cause. Reliance is placed on *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), which held it is improper to exclude a prospective juror in a capital case merely because he would be affected in deliberations by the fact that the death penalty might be imposed. It is not error, however, to exclude a prospective juror who would automatically vote against the death penalty regardless of the evidence. E.g. *Griffin v. State*, 665 S.W.2d 762 (Tex.Cr.App.1983); *Woolls v. State*, 665 S.W.2d 455 (Tex.Cr.App.1983); *Jernigan v. State*, 661 S.W.2d 936 (Tex.Cr. App.1983). The three prospective jurors addressed in appellant's grounds of error were properly subject to challenge for cause by the state on this ground, as reflected in the following excerpts of the record:

Prospective Juror Guyton:

 * * * * * *

"So can I take it from what you have said: Regardless of what the evidence was, you could just not answer those questions 'yes'?

"MRS. GUYTON: I could just not agree with capital punishment.

"MR. HENDERSON: Okay. But I need to ask you further: Could there be any circumstances or any evidence at all that would ever cause you to answer those questions 'yes'?

"MRS. GUYTON: There could be no circumstances, no."

 * * * * * *

"MR. STAFFORD: And, now again, like Mr. Henderson said, there are certain people who say, 'I just can't follow the law, regardless of what the situation is.'

"Do you think in your opinion that people like Charlie Manson out in California, who went in and killed all those ladies and cut open their stomachs and took their babies out, that they should not die at all? They should just live for the rest of their life?

"MRS. GUYTON: I think they should perhaps be punished, but not die from it.

"MR. STAFFORD: Okay. So in your opinion, regardless of how horrible the crime is—for example, like the guy down in Atlanta that killed all those young black boys, and it seemed like to be a very planned, premeditated—he sexually abused them, et cetera, and then killed them—that 'death' in that situation would not be a proper punishment?

"MRS. GUYTON: True. It is not a proper punishment.

"I don't think there is a crime—

"MR. STAFFORD: In your opinion.

"MRS. GUYTON: In my opinion.

"MR. STAFFORD: So you are telling me and my client that you could not in any situation put your feelings aside in regard to your feelings toward capital murder and follow the instructions that the Court gave you in regard to these questions?

"MRS. GUYTON: No, I couldn't put my feelings aside in regard to capital punishment.

"MR. STAFFORD: I have nothing else."

Prospective Juror Ewing:

 * * * * * *

"MR. HENDERSON: In other words, you just have a disagreement with the law to the point of not being able to follow it with regard to the death penalty?

"MR. EWING: Just the death penalty, yes.

"MR. HENDERSON: And if just because the law might say if you find beyond a reasonable doubt that these questions should be answered 'yes,' you must answer them 'yes,' are you saying you just would not be able to do that because of the way you feel?

"MR. EWING: Yes.

"MR. HENDERSON: And even if the Court instructed you to do that, are you saying you would answer them 'no' anyway, regardless of what the evidence showed?

"MR. EWING: Yes.

"MR. HENDERSON: And even if the evidence showed you or proved to you beyond a reasonable doubt that they ought to be answered 'yes,' are you saying you would answer them 'no' anyway?

"MR. EWING: If it has to do with the death penalty, yes.

"MR. HENDERSON: Now, what is going to happen—you would know what is going to happen if you answered the three questions 'yes.'

"MR. EWING: Yeah, definitely.

"MR. HENDERSON: The judge is going to sentence the defendant to death.

"MR. EWING: Yeah.

"MR. HENDERSON: We can do whatever we want to about saying you are just answering questions, but you know if those three questions are answered 'yes,' the Judge is going to sentence a defendant to death. There is no getting around that. Essentially you are making the finding.

"Knowing that, are you saying that you just couldn't follow the instructions that might be given to you by the Court with regard to what you needed to do in a particular situation in deciding these questions?

"Am I making myself clear?

"MR. EWING: Yes.

"MR. HENDERSON: So, are you telling the Judge, then that you just couldn't follow the law that might be instructed to you to do, that particular law being— 'That I just could not for that particular law, being that if I find beyond a reason-able doubt that the answers should be "yes," that I would answer them "yes." ' You are saying you just couldn't do that because of the way you feel about the death penalty?

"MR. EWING: Yes.

"MR. HENDERSON: And knowing that if you answered them that way, that the person was going to be sentenced to death?

"MR. EWING: Yes."

\* \* \* \* \* \*

Prospective Juror Jahnke:

"MR. STAFFORD: Are you telling me that you would answer one of the questions 'no' in a fact situation like that so the gentleman would not die? Even though you know—

"THE COURT: Let him answer the question, please, Counsel.

(The Court addresses the juror:)

"Your answer?

"MR. JAHNKE: Yes.

"MR. STAFFORD: I have no other questions.

"I suggest there is not cause.

"THE COURT: Your last 'yes' answer, sir, was the Court to understand that you said that you would answer one of the questions 'no' so that the death sentence would not be assessed?

"MR. JAHNKE: Well, I can't say 'possible,' so I have to say 'yes' or 'no'; so I have to say 'yes.' It is very possible, yes.

"THE COURT: Can you base your answers strictly on the evidence without considering the results of those answers?

"MR. JAHNKE: No.

"THE COURT: Knowing the results of the answers and taking them under consideration, can you strictly base your answers on the evidence and your interpretation of that evidence?

"MR. JAHNKE: No."

The grounds of error are overruled.

 Two other grounds of error are based on rulings by the trial court denying appellant's challenge for cause. Appellant

contends prospective juror Hamilton was subject to challenge for cause because of her personal acquaintance with the deceased and his widow and children. The record reflects the following on this subject:

"Q. You stated that you had never met Mr. Shirley yourself or have you had—

"A. I have never been introduced to him, no.

"Q. Did you see him in church?

"A. I am sure I have. I cannot recall him ever at a point. Our church is quite large. It is 5,000 membership and we have two church services and two Sunday School services, so it is very easy not to have seen him.

"Q. Okay.

"A. His wife, yes, I have seen.

\* \* \* \* \* \*

"Q. Okay. Having that exposure and having the relationship with the wife, I question in my mind how you can sit there and presume my client to be innocent.

"A. I did not have a relationship with the wife. I said I knew her. I would not consider myself a close friend or anything to her. I just knew her.

"Q. Okay. Let's talk about—how did you know her? In what capacity?

"A. Okay. In our church, there is like—our Sunday School department, at one time, and I don't remember the year or anything, she was the in-service member of our Sunday School department which means that she does not come to our Sunday School department, but she is on our row and that is how I know, you know.

"Q. What's her first name?

"A. Donna.

"Q. Donna. Well, Donna may testify in this case. Do you know her? She may be on that witness stand right where you are there.

"A. Yes.

"MR. HENDERSON: We object to that, Your Honor. She is not on the subpoena list.

"THE COURT: Sustained. Please keep it abstract, counsel.

"MR. STAFFORD: Well, Your Honor, I think hypothetically, I need to ask her in the event she testifies—

"THE COURT: Then ask her that.

"MR. STAFFORD: Okay.

BY MR. STAFFORD:

"Q. Let me phrase it this way. In the event she testifies, you as the prosecution has already told you, are going to be the judges of the credibility of the witnesses. And I am trying to think in my mind how you, knowing the lady, are going to start her off on the same level with the other witnesses. That it would appear to me that you would tend to give her more credibility and automatically believe her just because you know him.

"A. Just because I know who somebody is doesn't mean I am going to give her any preference over somebody else. I know her, but when it comes to close friends or somebody you have done something with, I could say yes, but as far as knowing who she is, you know, I do not know her personally.

"Q. You know she is the widow or the grieving widow in this situation, do you not?

"A. Yes.

"Q. And you saw the publicity on the television and you knew the—

"A. All I saw was where a police officer was shot. I never read anything else about it.

"Q. That's what I am saying. But you knew a police officer was shot?

"A. Right.

"Q. And you are active in the church, and I gather that his wife is somewhat active in the church.

"A. I suppose so.

"Q. Okay. And I am curious that if you were on the jury, giving you a hypothet, that Mr. Henderson gave that you had to make a choice of not guilty of capital murder or guilty of capital mur-

der, and you had no other choices, and if you believe beyond a reasonable doubt that my client intentionally and knowingly shot this man, but if you also believe beyond a reasonable doubt that he didn't know he was a police officer, okay?

"A. Yes.

"Q. Theoretically, and in theory, he is not guilty of capital murder. And if you vote not guilty, that means he will ride down on the elevator with you.

"And I am thinking in my mind, how you, Mrs. Patricia Hamilton, can go back to your church and face the grieving widow and say I let a murderer go?

"A. That has nothing to do with this. I am not trying her. I am not worrying about her feelings. I am trying to do—I mean, I don't see her. I don't think that has anything to do with this.

"Q. Well, see, I am being paranoid as you can understand.

"A. Well, I understand.

"Q. And now, I see a lady who is somewhat active in her church and I also—from the information I got, you know, we have a police officer who was active in the church and a wife who was active in the church, greatly loved by the members of the church, et cetera, and here I got a lady who could go back a time later after the trial and I am trying to figure out what kind of pressures the church could bring on you if for some reason you believe the State didn't meet its burden of proof.

"A. I don't understand.

"THE COURT: What's the question, counsel?

"THE WITNESS: I don't understand you.

BY MR. STAFFORD:

"Q. The question is how is it going to affect you?

"A. I don't think it has any effect. If I am in my own mind decided with a reasonable doubt, it will not have any effect."

\* \* \* \* \* \*

"THE COURT: Mrs. Hamilton, are you saying that you can or cannot set any personal feelings aside and answer the questions or make your determination strictly based on the evidence, or are you saying that this would affect your consideration?

"THE WITNESS: That would not affect because I did not know the people personally."

The trial court did not abuse its discretion in denying the challenge for cause when Mrs. Hamilton stated she could set aside her remote acquaintance with the family of the deceased. See *Anderson v. State,* 633 S.W.2d 851, 854 (Tex.Cr.App. 1982). The ground of error is without merit.

■ Appellant contends prospective juror Belcher was subject to challenge for cause because of bias against life imprisonment for capital murder. When the challenge for cause was denied, appellant exercised a peremptory challenge against Belcher. After having exhausted his peremptory challenges, appellant requested five additional strikes and was given one by the trial court. Assuming arguendo that the challenge for cause against Belcher should have been granted, the allowance of an extra peremptory challenge corrected any such error. See *Payton v. State,* 572 S.W.2d 677, 680 (Tex.Cr.App.1978). The ground of error is overruled.

■ In the last ground of error concerning jury selection, appellant asserts his rights under the VIth and XIVth Amendments to the United States Constitution were violated because the prosecutor exercised five peremptory challenges against prospective jurors who were black, because appellant is black and the deceased was white. The mere exercise of peremptory challenges is not sufficient to sustain the ground of error; there is no showing of systematic exclusion. See *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); *Phelps v. State,* 594 S.W.2d 434, 437–438 (Tex.Cr.App.1980). The ground of error is without merit.

Five grounds of error concern the trial on the merits. Two address rulings on the admissibility of evidence, two address jury argument, and one concerns the sufficiency of the evidence.

This case was prosecuted under V.T. C.A., Penal Code Sec. 19.03(a)(1), which makes a capital offense of the murder of a peace officer or fireman acting in the lawful discharge of an official duty and who is known by the accused to be a peace officer or fireman. Appellant challenges the sufficiency of the evidence to prove he knew the victim was a peace officer. In addressing this issue in his brief appellant fails to consider testimony given by defense witnesses on cross-examination by the state. In determining the sufficiency of the evidence it is proper to consider all of the evidence before the jury.

The record shows that appellant and the deceased were in a struggle before the fatal shooting. It was the state's theory that the deceased was attempting to arrest appellant on a fugitive warrant from Minnesota. Appellant was living in Houston under an assumed name to avoid apprehension. When the deceased confronted appellant he had his gun drawn, but the safety was on. Appellant noticed this fact and resisted the deceased. In the ensuing struggle appellant pulled a derringer from his back pocket and shot the officer twice, causing his death. The evidence was disputed as to whether the officer informed appellant that he was an officer and that he was placing appellant under arrest. It was appellant's testimony that the deceased did not announce his purpose or that he was an officer. It is undisputed that the deceased was working undercover and was not dressed as an officer. Appellant also presented testimony that he had previously been robbed in Houston by a man posing as a police officer making an arrest, and by this testimony sought to show mistake of fact. Two defense witnesses, however, testified on cross-examination to statements made to them by appellant that showed his knowledge that the deceased was a police officer.

One witness on cross-examination testified:

"Q. That the defendant said, that during the course of being there, that he looked at the gun and saw that it was not cocked and did not think it would fire without being cocked so that is when he got into the struggle over the gun?

"A. Yes.

"Q. That during the struggle over the cop's gun that they could not turn it either way, and then Arthur got his gun from his pocket and tried to shoot him in the nuts?

"A. That is correct.

"Q. That he, meaning the police officer, got up, or, I'm sorry—that he, meaning Arthur, jumped up, and then the cop got up and started to run, and that is when he fired at the cop?

"A. Yes.

"Q. And that when they were struggling on the ground, that a white guy came up, and the man that Arthur said he was wrestling with shouted he was a cop and needed help?

"A. Yes."

The other witness on cross-examination testified:

"Q. Do you recall saying in your statement here, 'Art turned around and saw a badge and a gun'?

"Is that what it says?

"A. Yes.

"Q. Did you say that?

"A. Yes.

"Q. Now that you have read your statement, your memory is refreshed to that point? Is that correct?

"A. Yes.

"Q. Did Arthur tell you, during the course of this struggle, that he grabbed for the gun?

"A. Yes.

"Q. He said they struggled for the cop's gun and they fell to the ground?

"A. Yes.

"Q. They rolled around, and the cop's gun had a safety on it and it would not fire.

"A. Yes.

"Q. And Art said that he got his gun, which is a Derringer, a .38, and fired one time at the cop as they were on the ground.

"A. I can't remember that, sir.

"Q. Why don't you use your statement here? May be it would help you refresh your memory.

"Arthur said that he got his gun, which is a Derringer, a .38, fired one time at the cop as they were on the ground, and the cop got up.

"A. Yes.

"Q. Is that the way you recall it?

"A. Yes.

"Q. That is what happened? Is that correct?

"A. Yes.

"Q. They were in the breezeway and ran toward the parking lot. Is that what happened, or is that what Arthur said happened?

"A. Yes.

"Q. Did he say the cop dropped his gun there in the breezeway?

"A. During the course of the struggle, he dropped his gun.

"Q. Said the cop dropped his gun in the breezeway. Did Arthur say that he thought there could have been another person outside and he followed?

"A. I don't understand that question.

"Q. Okay. Did Arthur tell you, that after the cop dropped his gun in the breezeway, that Arthur thought—told you that he thought there could have been another person outside, and he followed?

"A. Yes.

"Q. He followed and fired at the cop a second time with his Derringer in front of his girlfriend's car.

"A. Yes.

"Q. That is what Arthur said.

"A. Yes.

"Q. And he said this car was a '78 Cougar with, Louisiana plates, is that correct?

"A. Yes.

"Q. Art said that he picked up the cop's gun. Is that right?

"A. Yes.

"Q. And you asked Arthur why he shot a second time since he had hit him the first time. And Arthur said to you that he thought he was going to his car and his buddies. Is that right?

"A. Yes.

"Q. That is what Arthur told you?

"A. Related to the incidents that happened before

"Q. Well, did you say, 'I asked Art why he shot a second time since he had hit him the first time and Arthur said that he thought he was going to his car and his buddies.'

"A. Yes.

"Q. That is what Arthur told you?

"A. Yes.

"Q. Did Arthur tell you that another white guy came up while they were fighting over the cop's gun and told the man that he was a cop and to call the police?

"A. Yes.

"Q. That is what Arthur told you?

"A. Yes.

"Q. And this was before the first shot?

"A. No, sir.

"Q. It says, 'Arthur told me that another white guy came up while they were fighting over the cop's gun and he told the man that he was a cop and to call the police. This was before the first shot.'

"Does that refresh your memory?

"A. Yes.

"Q. Is that what Arthur said?

"A. Yes."

We find the evidence sufficient to prove appellant knew the deceased was a police officer. The ground of error is overruled.

■ Appellant challenges a ruling by the trial court that allowed the state to impeach one of its own witnesses by using a statement she had given police about statements made to her by appellant. A fact issue was raised as to whether the state

was surprised by her failure to testify in accord with her prior statement. It is also argued by appellant that her failure to testify as expected did not constitute injury to the state as required before impeachment of one's own witness is permitted. See *Houston v. State*, 652 S.W.2d 389 (Tex. Cr.App.1983). We need not decide the merits of the issue, nor the sufficiency of the objection at trial, as challenged by the state, because we find that even if the impeachment should not have been allowed, it was harmless in view of the testimony produced on cross-examination of defense witnesses and set out earlier in this opinion. The statements used to impeach the witness constituted admissions by appellant to that witness that were substantially the same as admissions by him shown on cross-examination of defense witnesses. The ground of error is overruled.

■ In another ground of error appellant complains of the exclusion of evidence of hospital records offered to support appellant's testimony that he had previously been robbed by a man posing as a police officer. Appellant had testified that he had shot that assailant in the arm. The hospital records showed treatment of a named individual for such an injury on that date. Appellant failed to show, however, that the man appellant shot and the man treated at the hospital were the same person. The evidence was excluded on this basis. Although counsel indicated to the trial court that he would seek a witness from the hospital who might identify as the person treated, a photograph of the man appellant had identified, no such witness was presented. Absent a showing of identity it was not error to exclude the evidence. The ground of error is without merit.

■ The remaining two grounds of error complain of jury argument. No trial objection was made, and the argument is not such that an instruction to disregard could not have removed any harm. The grounds of error are overruled.

The judgment is affirmed.

CLINTON, McCORMICK and MILLER, JJ., concur in the result.

TEAGUE, J., dissents to disposition of ground of error number one.

TOM G. DAVIS, J., not participating.