Charles RECTOR, Appellant,

v.

The STATE of Texas, Appellee.

No. 69050.

Court of Criminal Appeals of Texas, En Banc.

Nov. 5, 1986.

Roy E. Greenwood, court appointed on appeal, Austin, for appellant.

Ronald Earle, Dist. Atty., and Philip A. Nelson, Jr., Asst. Dist. Atty., Austin, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

TOM G. DAVIS, Judge.

Appeal is taken from a conviction for capital murder. V.T.C.A. Penal Code, Sec. 19.03(a)(2). After finding appellant guilty, the jury returned affirmative findings to the special issues under Art. 37.071(b), V.A.C.C.P. Punishment was assessed at death.

The indictment charged appellant with causing the death of Carolyn Kay Davis by drowning her, "the manner and means of effecting said drowning being to the grand jury unknown," and by shooting her with a gun, while appellant was in the course of committing and attempting to commit burglary of the habitation of Davis, kidnapping of Davis, and robbery of Davis.

In his fifth ground of error, appellant contends the evidence is insufficient to support the jury's verdict of guilty. He urges that the only "hard fact" linking him with the deceased was his possession of various items stolen from her apartment.

Mark Arnold testified that in 1981 he shared apartment number 204 of the La Paz Apartments in Austin with Davis. On the evening of October 17, he and Davis went grocery shopping. They left the store in separate vehicles, Arnold following Davis in his truck. Davis drove toward their apartment at 401 West 39th. Arnold testified that, to his best approximation, he saw Davis turn onto 39th at 8:45 p.m. Arnold drove on to make a deposit at his bank. This was the last time Arnold saw her alive. Davis's body was discovered in the Colorado River off Red Bud Island in Austin on October 18.

Arnold testified that Davis was wearing a pair of Calvin Klein blue jeans, size 6, "a light blue kind of striped, long-sleeved blouse," a gold chain necklace with gold star and diamond, a gold ring with a cross on it, and a high school class ring.

Arnold stated that he got back to the apartment at 9:15 p.m. When Arnold arrived at the apartment, he found the door unlocked and the lights on. He saw a bag of groceries overturned on the couch, and some clothes lying on the couch. Arnold went to the parking lot looking for Davis,

and saw her car, locked, with the interior light on and sacks of groceries still inside. Arnold went back to the apartment, entered the bedroom and saw that the window was open, the curtains were open, and the screen was "busted out." A Schrade lock-blade knife that did not belong to him or Davis lay on the floor beneath the window. Arnold saw that two of his rifles were missing and that "the bedroom and the closet were just in a shambles." He called the police and kept searching for Davis. Arnold noticed that his gym bag, containing a strain gauge used in engineering research, was also missing.

Two witnesses testified that they lived next door to Arnold and the deceased, in apartment 205. On the evening of October 17, they were sitting in the living room of their apartment when, "about nine o'clock or a little bit afterwards," they heard a girl's short, startled scream. They both rose to open the door. They heard the shuffle of feet and a door slam. The two went outside, saw nothing unusual, and heard nothing from the deceased's apartment. They went back inside. Ten minutes later Mark Arnold came to their apartment, looking for the deceased.

Another witness testified that he also was a neighbor of the deceased, and lived in apartment 203. At 9:00 p.m. on October 17, he was sitting in the living room of his apartment, waiting for friends. The window drapes were open. He heard three voices coming down the hallway. He heard one voice ask, "Where is it?", and a second one reply, "It's 204." The witness heard the voices pass his door and window. He stood up and looked out the window at them. He saw three black men. The shortest was wearing gray basketball trunks and white knee socks. Another was wearing overalls "with the straps here and, you know—little pad here." The witness could not distinctly remember whether the second man was wearing a shirt, but thought he was not. He could remember nothing about the third man's clothes. The witness did not see their faces.

The three men were standing in front of the deceased's door, talking. The witness watched them for about thirty seconds and then went back to his chair. He then heard a slam, a brief scream, and a sound like someone diving in the pool. The witness again looked out the window, but saw nothing. He then closed the drapes. The witness testified that there was a lot of walking back and forth in the hallway. When he heard a policeman's walkie-talkie about thirty minutes later, he came out of his apartment.

A fingerprint technician employed by the Austin Police Department testified that he arrived at the apartment at 9:35 p.m. to process its contents for latent fingerprints. The police investigating the incident had left by about 11:00 p.m., when the witness was collecting his gear to leave. The witness testified that the front door of the apartment was open, and that he heard footsteps coming up the landing. When he looked out the door, he saw two black men "walking pretty fast." The witness radioed for officers to look for the two men. The deceased's stepfather, who was also in the apartment at this time, gave chase. The witness was not asked what the two men were wearing. The stepfather did not testify.

Another resident of the apartment complex testified that at about 11:15 p.m. she saw appellant trotting through the complex, alone. Appellant asked, "Did you see two other black dudes around here?", and the witness said no. The witness did not recall what appellant was wearing.

Austin police officer William Mathews testified that he responded to a call at 11:30 p.m. on October 17th. The officer saw the fingerprint technician and the deceased's stepfather standing on the corner of 38–½ street and Avenue B, pointing east down 38–½. Mathews drove east along 38–½ and saw a 1969 green Buick Skylark stopped diagonally in the street. The trunk lid was up. The car went into reverse, "then started moving forward in a very quick manner." Mathews followed the car and saw it run a stop sign and a flashing red light. Mathews then stopped the car. As he approached the car, he saw

two rifles, a vinyl bag, and clothing in the trunk.

Appellant was the driver of the vehicle. He was alone in the car. When appellant got out of the car, Mathews saw that he was wearing "a pair of very tight designer blue jeans and no shirt."

Officer Mathews arrested appellant and took him to the city jail. Mathews searched him at the jail, and found in appellant's right front pocket a silver-colored watch, one gold chain, one gold chain with a green stone, one gold chain with a gold star and a diamond in the center, one gold ring "[having] a cross with a little circle on top of it," and "one lady's high school graduation ring, 1978, Anderson High School with initials CKD inside it."

Officer Mathews gave appellant some jail clothing to wear and took the blue jeans from him. Appellant was not wearing underwear.

The blue jeans were size 6, brand name Calvin Klein. An expert witness testified that he had tested the blue jeans for the presence of seminal stains and did find seminal stains in the crotch area of the blue jeans. Mark Arnold identified the blue jeans as the pair the deceased was wearing when he last saw her alive.

Arnold testified that the watch found in the blue jeans pocket belonged to him, and that it had been in a dresser drawer in the apartment. Arnold identified the necklaces as similar to ones the deceased was wearing, and he identified the rings as hers.

Arnold identified as his the two rifles and the strain gauge recovered from appellant's car, and identified a number of other items found in the car, principally clothing and a jar containing pennies, as his own or the deceased's. Arnold identified a blue striped blouse found in the trunk of appellant's car as the one deceased was wearing when he last saw her alive.

An Austin used car dealer testified that he sold appellant the car on October 15, 1981. The witness identified a document found in a billfold in the car as the receipt he had given appellant at the time of the sale.

On the right front seat of the car the police found a pair of bib overalls. In a pocket of the overalls was the driver's copy of a traffic citation issued to appellant and dated October 17, 1981. An Austin officer testified that he issued a traffic citation to appellant on that date. With the bib overalls was a leather sheath with a snap-over flap bearing the brand name Schrade. The Schrade knife found in the apartment fits the sheath found in appellant's car.

The police also found, on the right front floorboard of the car, a Rohm .22 caliber six-shot revolver. The cylinder held two live rounds, two spent shells, and two empty chambers.

The body of the deceased was taken from the river about 3:00 p.m. on October 18. The body was nude. The County Medical Examiner performed an autopsy at 5:45 p.m. The Medical Examiner testified that he found a gunshot wound to the head behind the right ear. The witness recovered a .22 caliber lead bullet from the deceased's brain. From the absence of stippling and powder burn, the witness formed the opinion that the barrel of the gun firing the shot was at least six inches away from the head. The witness testified that "usually [it] takes about 30 minutes to an hour for this type of injury to cause death." Based on the presence of water in her lungs, a dilated heart, bleeding in the middle ears, and an abundance of frothy pink fluid exuding from her nostrils and mouth, the witness formed the opinion that drowning intervened as the cause of deceased's death. The witness estimated the time of death to have been "around 11:00 p.m." on the 17th.

The Medical Examiner testified that the presence of scrapes on the anus, dilation of the anus, and reddened mucosa in the rectum led him to conclude that "a foreign object was introduced through her anus."

A firearms expert testified that the bullet recovered from the deceased's head was fired from a weapon having eight lands and grooves inclined to the right. The witness testified that her examination and test-firing of the Rohm .22 caliber revolver found in appellant's car revealed that it had eight

lands and grooves inclined to the right. The witness was unable to positively identify the bullet recovered at the autopsy as having been fired from the Rohm revolver taken from appellant, "due to the condition of the evidence bullet, the mutilation and the deformation ..."

A member of the grand jury that indicted appellant testified that the grand jury was unable to determine the manner and means of the drowning.

The defense put on three witnesses. A private investigator testified that he had a telephone conversation with the Medical Examiner on December 8, 1981. The witness testified that, in their conversation, the Medical Examiner expressed his opinion that the deceased died between 1:00 a.m. and 3:00 a.m. on October 18. The Medical Examiner testified that he did not remember the conversation. A deputy district clerk testified that Howard K. Simon and Anthony Miller were also indicted for the capital murder of Davis. (A police investigator had testified during the State's case that a fingerprint identified as Howard Simon's was found on the door of appellant's car.) Appellant did not testify.

The trial court charged the jury on the law of parties under V.T.C.A. Penal Code, Secs. 7.01(a) and 7.02(a)(2).

The evidence is circumstantial. The standard for appellate review of the sufficiency of the evidence is the same in direct and circumstantial evidence cases: "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). *Brandley v. State*, 691 S.W.2d 699 (Tex.Cr.App.1985); *Garrett v. State*, 682 S.W.2d 301 (Tex.Cr. App.1984) *cert. denied*, 471 U.S. 1009, 105 S.Ct. 1876, 85 L.Ed.2d 168 (1985); *Carlsen v. State*, 654 S.W.2d 444 (Tex.Cr.App.1983) (opinion on State's motion for rehearing).

Appellant relies on *Flores v. State*, 551 S.W.2d 364 (Tex.Cr.App.1977) for the proposition that an accused's recent, unexplained possession of the victim's stolen property is insufficient by itself to sustain a conviction for murder. In *Flores*, the evidence showed that the victim was alive on December 24, 1974, when a police officer gave him a speeding ticket. The victim was with "three Latin-American subjects" who were not described. The victim's body was found on January 19, 1975. There were bullet holes in the head and neck. From the evidence adduced, it was not possible to tell just when between December 24 and January 19 the victim died. The evidence did place the defendant in possession of the victim's car in Frio County about 24 hours after the officer saw the deceased alive in Mills County. At that time the defendant was with another person who was not identified. On February 6, 1975, the defendant was again found in possession of the victim's car, in Weslaco. Bloodstains were found on the car's front seat and on the defendant's shirt, but it was not shown when the stains could have been made. The blood was human, but could not be typed. The murder weapon was never found, although the State showed that it could have been a handgun the victim owned and took with him on his trip. A witness testified that sometime in January 1975, the defendant and his co-indictee asked the witness to keep a suitcase for them. The police found clothing and other items belonging to the victim in the suitcase.

In holding the evidence insufficient to support the conviction, this Court wrote:

"... [T]here is no showing that the appellant was at or near the scene of the crime and no showing as to actual time of the deceased's death. While the appellant was placed in possession of deceased's car on the dates mentioned as well as other items of deceased's property, this proof when coupled with all other circumstances to be considered amounts only to proof of a strong suspicion or mere probability that the appellant acting alone or together with another committed the murder charged. It does not exclude every other *reasonable* hypothesis except the appellant's guilt." [emphasis in original].

■ The evidence in the instant case, though circumstantial, when viewed in the light most favorable to the verdict, puts appellant outside the door of deceased's apartment minutes before she was missed. The evidence places appellant inside the deceased's ransacked apartment. The evidence shows appellant, about two and a half hours after the burglary, in possession of a number of items stolen from the apartment. The evidence shows appellant had in his car, on the night of the shooting, a weapon bearing the same characteristics as the one used to shoot the deceased. The evidence shows appellant wearing the deceased's clothing and in possession of her jewelry on the night she was killed and stripped of her belongings.

Viewing the evidence in this light, a rational trier of fact could have found the essential elements of capital murder under Penal Code Section 19.03(a)(2) beyond a reasonable doubt. See *Russell v. State*, 665 S.W.2d 771 (Tex.Cr.App.1983); *O'Pry v. State*, 642 S.W.2d 748 (Tex.Cr.App.1981); *Brasfield v. State*, 600 S.W.2d 288 (Tex.Cr.App.1980). Appellant's fifth ground of error is overruled.

In his sixth ground of error appellant contends that the evidence is insufficient to support the jury's affirmative finding to the first special issue at the punishment phase.[1]

■ The law of parties may not be applied to the three special issues in the punishment phase of a capital murder trial. *Green v. State*, 682 S.W.2d 271 (Tex.Cr.App.1984). That is, the State may not rely on evidence that another with whom the defendant was acting acted deliberately and with a reasonable expectation that death would result. *Id.* at 287. The jury must determine whether appellant's own culpable conduct which contributed to the deceased's death was committed deliberately and with the reasonable expectation that death would result. *Id.; Meanes v. State*, 668 S.W.2d 366, 379 (Tex.Cr.App.1983)

(Clinton, J., concurring). To determine whether the evidence is sufficient,

> "[t]he evidence must be reviewed in the light most favorable to the verdict to determine whether a rational trier of fact could have found the elements of Art. 37.071(b)(1) to have been proved beyond a reasonable doubt. [citation omitted] Then we must determine whether *the same* evidence supports an inference other than that appellant's conduct which contributed to causing the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result."

*Green*, supra at 288 (emphasis in original).

Appellant's jury was not charged on the law of parties at the punishment phase. They were instead charged on the special issues of 37.071(b) and then instructed that before answering "yes" to special issue one they must find from the evidence beyond a reasonable doubt that *appellant* intended or contemplated that the deceased's life would be taken during the commission of the offense. The jury so found. We will examine the evidentiary support for that finding.

There was some evidence that three men were involved in the offense at its beginning. There was no evidence, however, that anyone other than appellant was involved in the murder. At the time of his arrest, shortly after the time of the murder, appellant was alone, with all the loot from the robbery of the deceased and the burglary of her apartment, with the probable murder weapon, and wearing the dead woman's pants.

The instant offense was actually an escalating series of offenses, beginning, apparently, with the burglary of deceased's apartment. Then the victim came home and the crime became robbery. Deceased was abducted, making the offense kidnapping, followed possibly by sexual assault, and finally capital murder. Appellant was linked by the physical evidence to each of

---

1. "whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result ..." Article 37.071(b)(1), V.A.C.C.P.

these offenses: to the burglary because his knife was found in the apartment; to the robbery because he had the victim's jewelry, which she had been wearing, in his pocket when he was arrested. He was linked to the kidnapping and sexual assault because he was wearing the victim's semen-stained jeans. The evidence showed his involvement in the capital murder as well: the likely murder weapon was found in his car, with appellant driving and no passengers, when he was arrested near the victim's apartment, after her murder.

Finally, *after* the series of offenses that culminated in the victim's death was complete, it was appellant who was still in possession of all the physical evidence: the loot from the burglary, the jewelry from the robbery, and the gun with which the victim was probably shot; and he was wearing the victim's clothing. It is possible that appellant participated only in robbing, kidnapping, and stripping the victim of her jewelry and clothes, yet withdrew from the murder itself—only coming back afterward to retrieve the gun. No *evidence*, however, supports such an inference. The evidence supports only a theory of appellant's continuing involvement, from beginning to end.

The most compelling evidence that appellant acted deliberately and with the reasonable expectation that death would result is the offense itself. We may consider the circumstances of the offense to support a jury's affirmative finding to the first special issue. *Smith v. State*, 676 S.W.2d 379, 393 (Tex.Cr.App.1984). This issue must always be proven circumstantially. The jury had no way of judging appellant's mental state at the time of the offense other than by what he *did*.

The capital murder in the instant case was a deliberate sort of crime. There was no evidence that it was a result of a struggle or any other provocation. It did not occur at the scene of the original offense. The victim was abducted and taken miles from that location. She was isolated from potential rescue. She was robbed, stripped of her clothing, and possibly sexually assaulted before being murdered with a shot to the head. The whole string of offenses may have lasted as long as two hours. Each step produced more danger for the victim, more likelihood that she would be killed. This was not, as in, e.g., *Green*, supra, an interrupted burglary in which a struggle ensued, ending with the defendant's partner killing the victim. In *Green* this Court found the evidence sufficient to support the affirmative finding to the first special issue even though Green himself had not fired the fatal shot. He *had* "willingly participated in a planned burglary, entered a house holding a loaded gun, which is itself of probative value in proving deliberateness ..." *Green*, supra at 288. The evidence in the instant case also supports the theory that appellant entered the victim's apartment armed, intent upon either burglary or robbery.

■ Proof of deliberateness does not mean that the murder must be premeditated. *Granviel v. State*, 552 S.W.2d 107, 123 (Tex.Cr.App.1976), cert. denied, 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977). "To find the act of deliberateness, there must be the moment of deliberation and the determination on the part of the actor to kill." *Cannon v. State*, 691 S.W.2d 664, 677 (Tex.Cr.App.1985). In the instant case appellant had much longer than a moment to consider the likely result of his conduct.

The jury had all this evidence before it in answering the special issue. They also had evidence of appellant's past conduct. Evidence presented at the punishment phase showed that appellant had been twice indicted for robbery by firearms and had been convicted on those indictments of the lesser included offense of assault with intent to rob. Appellant had also been convicted of murder, committed in 1974 by shooting the victim with a gun. The State further showed that appellant had committed two unadjudicated offenses in 1981, the year of the instant offense. One was a robbery in October of that year, the other an aggravated robbery in June. In the aggravated robbery, appellant seized a female restaurant employee, held a gun to her head, and told the manager, "Open the safe or I'll kill her." Twice more during

the course of that robbery he threatened to kill his captive.

The jury thus knew that appellant had committed murder with a gun in the past. They further knew that he had committed several armed robberies, one as recently as six days before the instant offense. During the course of one of these robberies appellant had held a gun to a woman's head and threatened to kill her. If he had carried out his threat on that occasion the victim would have been killed in the same way the deceased in the instant case was killed, with a gunshot to the head. Such evidence is relevant to the first special issue. "It is also significant that the jury had at its disposal evidence of four prior convictions of the appellant for robbery by assault. The evidence shows the killing was done by an experienced robber, rather than an excited amateur." *Smith,* supra at 393. The evidence showed the same wealth of criminal experience in the instant case. The jury knew that appellant was a man who would commit dangerous offenses while armed with a firearm, that he carried those crimes to a conclusion if at all possible, threatening to kill if necessary, and that he would not stop short of committing murder.

■ Given this evidence as well as the evidence of the circumstances of the capital murder for which he was on trial, we find that the jury's affirmative finding to the special issue regarding the deliberateness of appellant's conduct was supported by the evidence. *Green,* supra; *Smith,* supra; *Stewart v. State,* 686 S.W.2d 118 (Tex.Cr. App.1984), cert. denied, 474 U.S. 866, 106 S.Ct. 190, 88 L.Ed.2d 159 (1985).

Appellant further contends that the Eighth and Fourteenth Amendments to the United States Constitution prohibit imposition of a death sentence in this case under the holding of *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (hereafter *Enmund* ). We disagree.

■ "*Enmund* does not prevent, under all circumstances, imposition of the death penalty against one convicted, as a party, of capital murder. *Enmund* prohibits assessment of the death penalty against any defendant who did not kill, attempt to kill, or intend or contemplate that life would be taken." *Meanes v. State,* 668 S.W.2d 366, 375 (Tex.Cr.App.1983). See also *Stewart v. State,* 686 S.W.2d 118 (Tex.Cr.App.1984), cert. denied, 474 U.S. 866, 106 S.Ct. 190, 88 L.Ed.2d 159 (1985).

Appellant further cites the recent decision of *Cabana v. Bullock,* 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986), for the proposition that the evidence was insufficient to justify imposition of a death sentence. The infirmity in both *Enmund* and *Bullock,* though, was not in the evidence per se, but rather in the trial court's instructions to the jury. In both cases the instructions allowed the jury to convict and to assess a death sentence if they found only that the defendant aided and abetted the underlying felony and that a killing occurred in the course of that felony. The jury was not required to make a finding concerning the defendant's own culpable mental state in regard to the murder:

> "[T]he instructions did not require a finding of any intent to kill on Bullock's part, nor did they require the jury to find that Bullock had actually killed ... Thus, it was quite possible that the jury had sentenced Bullock to death without ever finding that he had killed, attempted to kill, or intended to kill."

*Bullock,* 106 S.Ct. at 695. The Eighth Amendment would prohibit assessment of death in such circumstances because such a sentence could be imposed without any finding that the defendant was himself criminally responsible for the murder.

■ There was no such danger in the instant case. At guilt-innocence the jury was charged on the law of parties under V.T.C.A. Penal Code, Sec. 7.02(a)(2).[2] However, they were further instructed in the

---

**2.** "A person is criminally responsible for an offense committed by the conduct of another if:
...

"(2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense ..."

application paragraph of the charge that in order to find appellant guilty of capital murder they must find that he did "intentionally and knowingly cause the death of an individual ..." They could not find him guilty of capital murder only through his knowing and intentional participation in the underlying felonies. "The jury found appellant guilty either because he intentionally killed the deceased in the course of a robbery or because he intentionally solicited, encouraged, directed, aided, or attempted to aid [his codefendant] in the latter's efforts to kill the deceased in the course of a robbery." *Meanes,* supra at 376. The jury made the same finding in the instant case. This was sufficient to satisfy the requirement of *Enmund.*

Furthermore, the careful trial court in the instant case was apparently aware of the holding of *Enmund* (which was delivered the month before appellant's trial). In compliance therewith, the following additional charge was given to the jury at the punishment phase:

> "You are further instructed that before you may answer 'yes' to Special Issue No. 1, you must find from the evidence beyond a reasonable doubt that the defendant intended or contemplated that the life of [deceased] would be taken either by his own acts or the acts of another or others in his presence who were acting with him in the commission of the offense. If you do not so find, or if you have a reasonable doubt thereof, you will answer 'no' to Special Issue No. 1."

■ These instructions focused the jury's attention on appellant's own culpability in the murder, as required by *Enmund.* 102 S.Ct. at 3377. Sentence of death was imposed only after a finding that appellant himself killed, attempted to kill, or intended or contemplated that lethal force would be employed. *Id.* As demonstrated above, the evidence was sufficient to support that finding. Appellant's sixth ground of error is overruled.

■ In his eighth ground of error, appellant contends that the trial court erred "in failing to give appellant's special requested charge no. 1 during the punishment phase of the trial concerning a definition of the term 'deliberately'." This Court has held on several occasions that, because the term "deliberately" has not been defined by statute, the term is to be understood in its usual acceptation in common language and need not be defined in the charge to the jury. *Cannon v. State,* supra; *King v. State,* 553 S.W.2d 105 (Tex.Cr.App.1977) cert. denied, 434 U.S. 1088, 98 S.Ct. 1284, 55 L.Ed.2d 793 (1978). Appellant's eighth ground of error is overruled.

Appellant's third and fourth grounds of error concern the testimony of a State's rebuttal witness at the trial of one of appellant's co-indictees. The trial was held after appellant's conviction. Appellant filed a motion for new trial alleging that the witness's testimony constitutes newly discovered evidence. Appellant attached to his motion the court reporter's transcription of the witness's testimony. Appellant concedes the motion was untimely filed.

Appellant contends that the State withheld from him the fact of the witness's existence and the substance of her testimony. Appellant had filed a discovery motion seeking the names and statements of all witnesses. Appellant argues that the State violated the rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Appellant was tried in August of 1982. The co-indictee was tried in January of 1983. In his brief appellant states, "The records will reflect, I believe, that [the witness] informed the Austin Police Department of her testimony on or about October 24, 1981. Thus, at that time, the State had in its possession evidence of a res gestae exculpatory statement made by the Appellant to the arresting officer *and* evidence of the existance [sic] of [the witness] that were corroborative of [a statement appellant made to police]."

Since *Brady,* the Supreme Court of the United States has elaborated on the showing a defendant must make in order to win a new trial based on the suppression of favorable evidence. In *Moore v. Illinois,*

408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972), the Court said:

> "The heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence."

92 S.Ct. at 2568. We believe appellant's claim fails on all three bases.

■■■ The witness who testified at the trial of appellant's co-indictee was a State's rebuttal witness who had been employed at a convenience store at Airport and 51st in Austin on the night of the offense. She testified that some time between 11 p.m. and midnight that night three black men entered her store and lingered for fifteen or twenty minutes. She identified appellant as one of these men and his co-indictee as another. After these two had stayed in her store for some time, with the third man waiting outside, a pickup truck pulled up outside. Asked to tell how the three men who had been in her store departed, the witness testified, "The gentleman that had been standing outside got in a dark colored pickup with some other people in back of it and left. And the two that were in the store [including appellant] had got in the car they pulled up in and left. And I did not see which direction they went." Appellant claims this evidence was exculpatory because it placed him elsewhere in Austin at the time of deceased's death and because it corroborated a story he gave police soon after his arrest explaining how he had come into possession of the stolen goods found in his car. We disagree.

As for the alleged alibi, the witness testified that appellant came into her store some time *after* 11 p.m. She was sure of that time because she had already begun cleaning up in preparation for closing, and she always began that cleanup at 11 p.m. Appellant claims this exonerates him in the deceased's death because the medical examiner testified at appellant's own trial that the deceased died at 11 p.m. Dr. Bayardo's testimony, however, was that "she most probably died around 11 p.m." that night. He further testified that "there is not a precise scientific method to determine the time of death. These are all rough estimates." This estimate was complicated in the deceased's case because the body had been in water overnight, meaning it would cool at a different rate.

Furthermore, the gunshot wound that would have killed deceased was inflicted some time prior to her actual death by drowning. The medical examiner testified that that type of wound would take thirty minutes to an hour to cause death. Therefore the fatal shot could have been fired up to an hour before the actual time of death, which could not be precisely determined. Other evidence showed that the deceased had been abducted from her apartment at about 9 p.m. Testimony that appellant was seen in a convenience store some time after 11 o'clock in no way refutes the State's theory that he caused the death of deceased.

Appellant further contends that the testimony corroborated a statement he gave to police soon after his arrest that he had been stopped at a grocery store at 38th and Guadalupe when a pickup truck containing a black man and a white man had pulled up. According to appellant's statement the two men sold him the two rifles, woman's clothing, and gym bag containing the strain gauge found in his car at the time of his arrest. The witness's testimony, however, corroborates this story in no detail except that a pickup truck drove into the parking lot of a grocery store—at a different location than the one claimed by appellant. The witness saw no contact between appellant and the occupants of the pickup truck. No property changed hands, no discussion took place, and the truck departed separately from the car carrying appellant. Furthermore, neither appellant's statement nor the witness's testimony accounts for the other items in appellant's car that had been stolen from deceased's apartment, such as a jar of pennies; nor for the fact that appellant's knife was found in the

deceased's apartment and appellant himself was seen in the laundry room of the deceased's apartment complex shortly before his arrest. We find that the witness's testimony was not exculpatory.

Neither was it material under the test established by *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), which stated, "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." 96 S.Ct. 2400. The information undisclosed to the defense will not require a new trial "unless [the] omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." *Id.; Carmona v. State,* 698 S.W.2d 100, 105 (Tex.Cr.App.1985). The testimony of the witness in the instant case was not of such significance.

Furthermore, there is no showing that the evidence was suppressed. The only evidence in the record relevant to when the State knew of the witness and the substance of her testimony is the following exchange from her testimony at the co-indictee's trial:

"Q. Are you acquainted with an Officer—a policeman by the name of Anderson? Andy Anderson?

"A. Yes.

"Q. When did you first meet Mr. Anderson, if you did?

"A. It was on a Friday evening.

"Q. What Friday evening?

"A. The week following this incident on Saturday night [October 17, 1981] with these gentlemen in the store.

"Q. Is that the first occasion—

"A. Yes.

"Q. —that you met Andy Anderson?

"A. Yes.

"Q. Have you seen him since, that is Mr. Anderson?

"A. Yes.

"Q. When was that?

"A. About two weeks ago?

"Q. Did he come looking for you?

"A. Yes. Found my roommate.

"Q. Is that only the second time in your life that you ever saw Andy Anderson?

"A. Yes.

"Q. Your testimony is that it was the Friday during the week immediately after the Saturday that you observed [the defendant] and Rector in the Utotem store at 51st and Airport at approximately 11:00 p.m. that you first met Andy Anderson.

"A. Yes."

The opinion of *Brady v. Maryland,* supra, summarized the rule established by the case as follows:

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

In *United States v. Agurs,* supra, the Supreme Court described the *Brady* rule as applicable to situations that involve "the discovery, after trial, of information which had been known to the prosecution but unknown to the defense."

The record does not reflect that the existence of the witness or the substance of her testimony were known to the prosecution at the time of appellant's trial. Appellant's third ground of error is overruled.

Appellant's fourth ground of error states:

"THE TRIAL COURT AND THE TEXAS COURT OF CRIMINAL APPEALS DENIED APPELLANT DUE PROCESS OF LAW BY DENYING APPELLANT'S MOTIONS TO FILE AN *OUT-OF-TIME* MOTION FOR NEW TRIAL, BASED UPON NEWLY DISCOVERED EVIDENCE, I.E., THE DISCOVERY OF THE EXISTANCE [sic] AND TESTIMONY OF WITNESS CAROLYN STILLWELL, WHOSE TESTIMONY WAS FAVORABLE TO THE DEFENSE AND HAD NOT BEEN DISCLOSED TO THE DEFENSE DURING APPELLANT'S TRIAL, THUS DEPRIVING THE APPELLANT OF DUE PROCESS OF LAW." [emphasis by appellant].

On March 10, 1983, this Court denied appellant's motion for an extension of time within which to file an Out-of-Time Motion for New Trial. Now, on direct appeal, appellant assigns that denial as error. We find that appellant's contention is in the nature of a motion for rehearing on our original order denying his motion for extension of time. Assuming that this Court had jurisdiction to hear such motion, our original order is now final. The time for filing a motion for rehearing is past. Tex. Cr.App.R. 309. (See now Tex.R.App.Pro. Rule 230.) We decline to address appellant's contention that this Court erred in denying the motion for extension of time.

The record does not reflect that the trial court ruled on the motion for new trial. Appellant also filed a "Motion for Hearing on Motion for New Trial". This document bears a notation, signed by the trial judge: "Motion for New Trial not filed within time specified by statute." The note is dated 3/18/83. In his brief, appellant states that "on March 18, 1983, the trial court entered an order refusing to file the Motion for New Trial because: 'Motion for New Trial not filed within time specified by statute.' Therefore, the actual merits of Appellant's Motion for New Trial have not been presented to the trial court."

The record contains no order refusing to file the motion for new trial, nor any reference to such an order. The motion appears in the record bearing the district clerk's file mark. No further proof of the fact of the filing of the document with the clerk is necessary. Art. 40.09(6)(b), V.A.C.C.P. Contrary to appellant's contention, the trial court did not deny appellant the right to file an out-of-time motion for new trial. Appellant's fourth ground of error is overruled.[3]

In his first and seventh grounds of error appellant contends the trial court erred in overruling his challenge for cause to two veniremen.

Appellant used a peremptory challenge against each venireman and neither served on the jury. Later in the voir dire appellant used up the remainder of his fifteen peremptory challenges. Thereafter, the trial court allowed appellant three additional peremptory challenges. Subsequently, appellant sought but was refused five additional peremptory challenges. Appellant named the last two jurors seated as unacceptable to him.

If the trial court erred in overruling the two challenges for cause, the error was cured when the trial court compensated appellant by granting him three additional peremptory challenges. *Williams v. State*, 682 S.W.2d 538 (Tex.Cr.App.1984); see also *Pierce v. State*, 696 S.W.2d 899 (Tex.Cr.App.1985). The trial court more than compensated appellant with the grant of three additional peremptories, and the error, if any, in overruling appellant's two challenges for cause is not reversible. Appellant's first and seventh grounds of error are overruled.

In his second ground of error, appellant contends that,

"THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SHUFFLE THE JURY PANEL (T.R. 55) IN VIOLATION OF ARTICLE 35.11, V.A.C.C.P., OVER APPELLANT'S OBJECTION THAT HE HAD A RIGHT TO INSPECT THE JURY PANEL PRIOR TO EXERCISING HIS RIGHT TO SHUFFLE ..."[4]

---

3. Appellant concedes that his motion for new trial was untimely and asks us to consider the testimony of Carolyn Stillwell attached to his motion for new trial as a bill of exception. We have reviewed such testimony under appellant's *Brady v. Maryland* ground of error, above. Even if this matter were properly before us, we would find no merit to appellant's claim.

4. Article 35.11, V.A.C.C.P. provides:
"The trial judge, upon the demand of the defendant or his attorney, or of the State's counsel, shall cause the names of all the members of the general panel drawn or assigned as jurors in such case to be placed in a receptacle and well-shaken, and the clerk shall draw therefrom the names of a sufficient number of jurors from which a jury may be selected to try such case, and such names shall be written, in the order drawn, on the jury list from which the jury is to be selected to try such case, and write the names as drawn upon two slips of paper and deliver one slip to the State's counsel and the other to the defendant or his attorney."

At the earliest point in the trial where this issue arose, the record reflects the following:

"[DEFENSE COUNSEL]: We've got a— Mr. Rector has here to be filed, I take it, a Motion to Shuffle, but at the same time we would like to hold of[f] on filing the Motion to Shuffle until we actually see what the order is."

The trial court made it plain to the defense that the district attorney had already requested a shuffle, that the list had been shuffled, and that the court would not shuffle the panel again.

The second time the issue came up, the record reflects the following:

"[DEFENSE COUNSEL]: Your Honor, we have another—we would like to reserve the opportunity to shuffle the jury panel, but at the same time, Your Honor, we would like an opportunity to see what it is before we offer that motion.

" . . .

"THE COURT: The District Attorney has already made a Motion to Shuffle, and that motion has been granted. And they will be shuffled and a second list then will be prepared. And I'm not going to shuffle them a third time."

The record reflects that on the day voir dire was set to begin the trial court summoned a group of fifty veniremen from the "central jury room." The trial court made known its intention to call two additional groups of fifty, if the need arose, on the following Wednesday and Monday, respectively. Appellant claims that he moved to shuffle each of the two panels of fifty from which the jury was ultimately chosen, and that the trial court reversibly erred by denying the motion.

The record reflects the following:

"[DEFENSE COUNSEL]: One moment, Your Honor. I'd like to put on the record my Motion to Shuffle. I have just filed a Motion to Shuffle on which I've requested that the Court shuffle the entire jury panel because of the fact that this morning, at the conclusion of—or at the first list of jurors that were delivered to the defense counsel, of the 26 names

that we examined, only two would have been acceptable.

"Because of that, we're asking the Court to shuffle the entire jury panel. The whole 150 names.

"THE COURT: I don't have 150 names. I've only made a request from the central jury room for 150 names over the time from today, Wednesday and next Monday. This list is all the jurors that we have at this time.

"It's possible we'll get the jury from this list of 50, and I do not have a list of the others at this time to give you. I have shuffled, at the request of the District Attorney, all the 50 jurors that we have at this time, and that's the complete panel that we have at this time.

[DEFENSE COUNSEL]: "Note our exception, Your Honor."

The first group of fifty veniremen did not yield a jury. The trial court called up a second group of fifty. The district clerk shuffled the names in this second group and handed the resulting list to counsel. At that point defense counsel stated: "Your Honor, we would renew our objection in that Article 35.11 specifically provides that the entire list be put together and shuffled as opposed to the piecemeal shuffling that has been going on in this particular case."

Appellant claims that he first sought an opportunity to view each group of fifty veniremen seated in the courtroom, and that when this opportunity was denied he moved the trial court to shuffle each group of fifty names. Appellant relies on *Stark v. State*, 657 S.W.2d 115 (Tex.Cr.App.1983) (per curiam), and *Hall v. State*, 661 S.W.2d 113 (Tex.Cr.App.1983).

We held in Hall, supra, that:

"in capital murder cases which do not involve a special venire, see Art. 34.01, supra, when timely and properly requested, the accused is entitled to have the names of those persons *assigned to and seated in the courtroom where the cause is to be heard,* shuffled or redrawn. In denying [defendant's] request to have the first 'mini jury panel' of prospective jurors assigned to and seated

in the courtroom shuffled or redrawn, the trial judge reversibly erred."

In both *Hall* and *Stark*, however, the defendant moved the trial court to shuffle the names of the jurors who had been seated in the courtroom, that is, whose names had been "drawn or assigned as jurors." See Art. 35.11, supra. In the instant case, by contrast, the record reflects that appellant twice sought to have shuffled 150 names, at times when the trial court did not have 150 names to shuffle. Thus, on one interpretation, appellant's motion to shuffle requested the impossible. When a motion to shuffle requests an impossibility, the denial of such a motion is not error. See *Gonzalez v. State*, 468 S.W.2d 85 (Tex.Cr.App.1971).

On another interpretation, appellant's motion requested an action exceeding the scope of Art. 35.11, supra. Article 35.11 commands the trial court to shuffle the names "drawn or assigned as jurors" in the cause. On this second interpretation, appellant's motion would have the court draw more names, add those names to those already drawn, and shuffle the resulting total. Article 35.11, however, applies only to the jury panel for the particular case. *Williams v. State*, 719 S.W.2d 573, 575 (Tex.Cr.App.1986). Appellant's request was that names of jurors not yet assigned to the case be shuffled. Article 35.11 does not grant this right. Accordingly, the trial court did not err in refusing the requested action.

The judgment is affirmed.

CLINTON and TEAGUE, JJ., concur in the result.