

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-76,455

### Ex parte ARTHUR LEE WILLIAMS, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### FROM HARRIS COUNTY

**KELLER, P.J., delivered the opinion of the Court in which MEYERS, WOMACK, KEASLER, HERVEY, and COCHRAN, JJ., joined. KEASLER, J., filed a concurring opinion in which HERVEY, J., joined. COCHRAN, J., filed a concurring opinion in which Hervey, J., joined. ALCALA, J., filed a dissenting opinion in which JOHNSON, J., joined. PRICE, J., concurred. JOHNSON, J., dissented.**

In 1983, applicant was convicted of capital murder and sentenced to death.[1] We affirmed his conviction on direct appeal.[2] Subsequently, applicant filed an application for a writ of habeas corpus.[3] We filed and set seven of his allegations. Concluding that none of his allegations have

---

[1] TEX. PENAL CODE §19.03(a); TEX. CODE CRIM. PROC. art. 37.071.

[2] *Williams v. State*, 682 S.W.2d 538 (Tex. Crim. App. 1984).

[3] TEX. CODE CRIM. PROC. art. 11.071.

merit, we deny relief.

## I. BACKGROUND

Applicant was on parole in Minnesota for aggravated robbery. He left a halfway house without permission and came to Texas. An arrest warrant was issued for the parole violation, and Daryl Wayne Shirley, a plainclothes police detective, came to the apartment complex at which applicant was staying to arrest him on that warrant. During a struggle between the two, applicant shot and killed Detective Shirley.

## II. STANDARDS (INEFFECTIVE ASSISTANCE OF COUNSEL)

Most of the allegations that we filed and set involve claims that trial counsel, James Stafford, was ineffective. To establish a claim of ineffective assistance, an applicant must show (1) that defense counsel's performance was deficient, and (2) that the applicant suffered prejudice.[4]

To show deficient performance, an applicant must demonstrate that counsel's representation fell below an objective standard of reasonableness.[5] Every effort must be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.[6] Consequently, judicial scrutiny of counsel's performance is highly deferential, and there is a presumption that, under the circumstances, the challenged action might be considered sound trial strategy.[7] In addition, to successfully assert

---

[4] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[5] *Id.* at 687-88.

[6] *Id.* at 689.

[7] *Id.*

that trial counsel's failure to object amounted to ineffective assistance, the applicant must show that the trial judge would have committed error in overruling such an objection.[8] Moreover, counsel will not be held ineffective if the claimed error is based upon unsettled law.[9]

To establish prejudice, an applicant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.[10] A reasonable probability is a probability sufficient to undermine confidence in the outcome.[11] A finding of prejudice cannot be based upon pure speculation,[12] and it is more difficult to show harm under the prejudice prong of *Strickland* than under the direct-appeal standard for non-constitutional errors.[13]

In the present proceeding, Stafford appears to have "fallen on his sword." We count twenty-nine instances recited in his affidavit in which he claims that he performed deficiently at trial, only some of which involve claims that have been filed and set for briefing. It is a serious matter when this Court is confronted with an attorney who so pervasively impeaches his own conduct.

Out of perfectly laudable motives, a conscientious lawyer may be unduly prone toward second-guessing his performance when he has failed to obtain the result for which he had hoped. Or, he may have conducted a harsh but honest self-assessment of his performance. A defendant is

---

[8] *Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011).

[9] *Ex parte Smith*, 296 S.W.3d 78, 81 & n.9 (Tex. Crim. App. 2009); *Ex parte Chandler*, 182 S.W.3d 350, 358-59 (Tex. Crim. App. 2005).

[10] *Strickland*, 466 U.S. at 694.

[11] *Id.*

[12] *Ex parte Cash*, 178 S.W.3d 816, 818-19 (Tex. Crim. App. 2005).

[13] *Martinez*, 330 S.W.3d at 903-04.

not entitled to perfect or errorless counsel.[14]   Nevertheless, when addressing the question of ineffective assistance of counsel, we should take into account an attorney's admission of fault.  With these considerations in mind, we turn to the claims that we filed and set.

### III. VOIR DIRE (I.A.C.)

#### A. Prosecutor's Comments on "Probability"

In claim four, subsection one, applicant contends that Stafford was ineffective because he "failed to object when the prosecutor told veniremen that the term 'probability,' as applied to the special issue on future dangerousness, could mean 'one in a million.'" Applicant contends that the complained-of comments were made to eleven prospective jurors upon whom applicant exercised peremptory challenges, to ten of the prospective jurors who served on the jury, and to the alternate juror.

The prosecutor informed these prospective jurors that there was no definition for the term "probability," that it was whatever the term meant to the juror, and that to some it might mean a "one in a million chance" but to others it might mean "likely."  Stafford did not object to these comments. In an affidavit in the habeas proceedings, Stafford says that he should have objected.

#### 1. *No Deficient Performance*

Relying upon Webster's Seventh New Collegiate Dictionary, applicant contends that "probability" means "something probable" and that "probable" means "supported by evidence strong enough to establish presumption but not proof" or "likely to be or become true or real."  Though we have not reviewed applicant's source, our review of other versions of Webster's Dictionary suggests

---

[14]  *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006).

definitions similar to those given by applicant,[15] but we note an additional entry in the definition of

"probability" relating to statistics:

> **3a** (1): the ratio of the number of outcomes in an exhaustive set of equally likely outcomes that produce a given event to the total number of possible outcomes (2): the chance that a given event will occur.[16]

Dissenting in *Jurek v. State*,[17] Judges Odom and Roberts lamented what they believed to be

the vagueness of the term.[18] Judge Odom suggested that "probability" could be a very small degree

of likelihood:

> What did the Legislature mean when it provided that a man's life or death shall rest upon whether there exists a "probability" that he will perform certain acts in the future? Did it mean, as the words read, is there a probability, some probability, any probability? We may say there is a twenty percent probability that it will rain tomorrow, or a ten or five percent probability. Though this be a small probability, yet it is some probability, a probability, and no one would say it is no probability or not a probability. It has been written: "It is probable that many things will happen contrary to probability," and "A thousand probabilities do not make one fact." The statute does not require a particular degree of probability but only directs that *some* probability need be found.[19]

He also cited a statistical text on the meaning of probability but rejected the definition as one that

---

[15] WEBSTER'S THIRD NEW INT'L DICTIONARY [unabridged] 1806 (2002) (definitions of "probability" and "probable") (entries for "probable" include: "a. that is based on or arises from adequate fairly convincing though not absolutely conclusive intrinsic or extrinsic evidence or support b. that can reasonably and fairly convincingly be accepted as true, factual, or possible without being undeniably so"); http://www.merriam-webster.com/dictionary/probability; http://www.merriam-webster.com/dictionary/probable (applicant's definitions).

[16] WEBSTER'S THIRD NEW INT'L DICTIONARY [unabridged] 1806 (definition of "probability"); http://www.merriam-webster.com/dictionary/probability.

[17] 522 S.W.2d 934 (Tex. Crim. App. 1975), *aff'd*, *Jurek v. Texas*, 428 U.S. 262 (1976).

[18] *Id.* at 945-46 (Odom., J., concurring and dissenting); *id.* at 946-48 (Roberts, J., dissenting).

[19] *Id.* at 945 (Odom, J., concurring and dissenting).

would require the future-dangerousness issue to "be answered in the affirmative for all men, no matter how saintly."[20]  Judge Roberts, on the other hand, felt that "probability" had a technical meaning, and he therefore had to employ the statistics definition, with the result that "probability" meant "simply a chance—however large or small—as measured and defined in mathematical or statistical terms."[21] The meaning of the word "probability," and the concerns raised by Judges Odom and Roberts, were not addressed by the Court's opinion in *Jurek*.[22]

The Court first addressed the meaning of "probability" in 1987, four years after applicant's trial.[23]  In that case, *Cuevas v. State*, a prospective juror was extensively questioned about his understanding of the term.[24]  We explained that, because "probability" was not defined, it was to be taken and understood "in its usual acceptation in common language," and jurors were presumed to know and apply that meaning.[25]  We further explained that a trial court "may totally foreclose any examination of a veniremen's understanding of the term," to prevent voir dire from becoming

---

[20]  *Id.* at 945-46.

[21]  *Id.* at 948 (Roberts, J., dissenting).

[22]  *See id.* at 936-43 (Court's op.), 944-45 (Odom, J., concurring and dissenting) ("The word 'probability' is not examined by the majority.  This concept is at the core of the issue submitted under this subsection, yet the majority seek neither to define it nor to discuss its meaning."), 947 (Roberts, J., dissenting) ("In view of this serious challenge to the statute now confronting us, it is incumbent upon this Court to determine whether it is possible to define the phrase 'a probability.' This the majority has not done.").

[23]  *Cuevas v. State*, 742 S.W.2d 331, 346-47 (Tex. Crim. App. 1987).

[24]  *Id.* at 346.

[25]  *Id.*

endless through the asking of unnecessary questions.[26]  Nevertheless, quoting Black's Law

Dictionary and Webster's Collegiate Dictionary, we briefly explored the meaning of the term, with

definitions that comport with applicant's understanding.[27]  Two years later, citing *Cuevas* and the

dissents in *Jurek*, we held that the future-dangerousness issue "calls for proof of more than a bare

chance of future violence."[28]  In later cases, we explained that a juror was required to employ an

understanding of "probability" that was "more than a mere possibility."[29]

But at the time of applicant's trial in 1983, there was no decision from this Court on the

meaning of "probability," and Judge Roberts had suggested, albeit in dissent and as a reason for

finding the scheme unconstitutional, that probability meant "any chance."  We think Judge Roberts

was mistaken to rely upon a statistics definition because, though one may refer to "probability" in

the abstract in statistics or mathematics, when the term is used in connection with a statistical or

---

[26]  *Id.* (citing *Esquivel v. State*, 595 S.W.2d 516, 525 (Tex. Crim. App. 1980)).  *See also Battie v. State*, 551 S.W.2d 401, 404-05 (Tex. Crim. App. 1977).  Implicit in this holding was that, though the parties had no right to engage in such questioning, the trial judge had the discretion to allow it.  We later decided that the parties had a right to question prospective jurors on whether they could distinguish between a "probability" and a "possibility," but that holding was not made until 1992.  *See Hughes*, 878 S.W.2d 142, 147 n.6 (Tex. Crim. App. 1992).

[27]  *Id.* at 347 (quoting BLACK'S LAW DICTIONARY 1081 (5th ed. 1979) for definitions of "probability": "likelihood; appearance of reality or truth; reasonable ground of presumption; verisimilitude; consonance to reason . . . . A condition or state created when there is more evidence in favor of the existence of a given proposition than there is against it."; quoting WEBSTER'S NEW COLLEGIATE DICTIONARY (1980) for definition of probability as "something that is probable," with "probable" meaning "supported by evidence strong enough to establish presumption but not proof; likely to be or become true or real").

[28]  *Smith v. State* 779 S.W.2d 417, 421 (Tex. Crim. App. 1989).

[29]  *Murphy v. State*, 112 S.W.3d 592, 600 (Tex. Crim. App. 2003) (quoting *Hughes v. State*, 878 S.W.2d 142, 148 (Tex. Crim. App. 1992)).

mathematical determination, a specific numerical qualifier is always assigned (e.g. a 1 in 20 probability, a .05 probability, or a five percent probability). Because the term "probability" is part of a determination in the future-dangerousness issue, its use without a numerical qualifier precludes the statistics definition. Moreover, given the obvious purpose of the future-dangerousness special issue, it seems incongruous to describe probability as "any chance" or even "one chance in a million." But what seems obvious to us now does not make counsel's conduct in 1983 ineffective. Under the circumstances, and given the absence of controlling caselaw on the subject, we cannot find that defense counsel performed deficiently in failing to object that the prosecutor gave an incorrect definition when he stated that "probability" could mean "one chance in a million."

### 2. *No Prejudice*

It is important to point out that the prosecutor did not purport to define "probability" as meaning "one chance in a million." Rather, the prosecutor said that "one chance in a million" was one possible meaning of the term, but that the jurors were to employ their own understanding. Applicant has presented us with no reason to believe that any of the jurors employed a "one chance in a million" definition of "probability." The incongruity of such a definition is itself reason to conclude that it was not used by the jurors—a conclusion that finds support in the record in this case. In every instance in which one of the prospective jurors identified by applicant was questioned about his actual understanding of the term, the prospective juror conveyed an understanding that was consistent with the definitions now advocated by applicant on habeas.

Prospective juror Risinger explained that "probability" meant to him "more than likely it would happen again." Defense counsel presented to some of the prospective jurors a hypothetical

involving a deck of cards that contained mostly black cards and only a few red cards.[30] Prospective juror Hinojosa agreed that the chance of drawing a red card was a possibility but could not be equated with a probability. When asked by defense counsel, "See what I'm saying?" regarding whether drawing a red card would be possible rather than a probability, prospective juror Borski answered, "Yes, sir," and he affirmed that he would "hold the State to that burden." When asked whether she thought "probability" and "possibility" mean the same, prospective juror Quayle responded, "No." When defense counsel suggested that some people equate probability with possibility, but "probably" involves a game of odds, prospective juror Whaley responded, "That is a [sic] stronger." Although prospective juror Butaud indicated in some of his answers that he would automatically find a person to be a future danger after a conviction for capital murder, Butaud indicated that it was because a person who commits capital murder "is probably capable of anything," but that conclusion would not necessarily be true of someone who committed a lesser offense.[31] When asked whether the future-dangerousness special issue could be answered "yes" or "no" based upon the evidence, prospective juror Stout responded, "Not as easily [as the deliberateness special issue], but – certainly it would have to be an answer of 'yes' or 'no,' one way or the other." Prospective juror Williams suggested that the future-dangerousness issue required the

---

[30] The hypothetical varied from fifty-one cards to fifty-two total cards in the deck, with the deck containing forty-eight or forty-nine black cards and the remaining cards being red.

[31] The prosecutor subsequently presented a hypothetical involving a starving elderly couple, where the husband decides to rob a store to get money to buy food and shoots the store owner only after the store owner pulls a gun and attempts to shoot him. After hearing that hypothetical, Butaud agreed that he would not automatically answer the future-dangerousness issue "yes" just because a defendant has been convicted of capital murder.

jury to be a "psychiatrist."

By our count, half of the prospective jurors who ended up on the jury gave responses that were consistent with applicant's understanding of the term "probability" and inconsistent with defining "probability" as a "one in a million chance." The other half were not asked questions that would have shed light on their views of the matter, but we have no reason to conclude that these jurors would have employed the "one in a million chance" definition.[32]

The prospective jurors who were struck did not serve on the jury and would therefore have had no occasion to employ any faulty understanding of "probability." An argument for applicant being harmed could be made if it could be shown that applicant was forced to use eleven peremptory strikes solely on the basis of the prosecutor's "one in a million chance" statements. The fact that trial counsel never objected to these statements suggests that peremptory strikes were not used to correct any perceived taint flowing from them. Moreover, if the prosecutor's comments had in fact motivated the strikes, one would expect prospective jurors to be struck all in a row, but the strikes alternated on a relatively even basis.[33]

Further, it is readily apparent from the record that these prospective jurors were struck for reasons that have nothing to do with the prosecutor's comments. Prospective jurors Risinger and Hinojosa made statements that favored the defense on the meaning of probability, and so were

---

[32] The alternate juror's views on the matter are unknown but immaterial because the alternate did not serve on the jury.

[33] Of the jurors to whom the prosecutor made the complained of comments, the first, second, fourth, fifth, ninth, tenth, fourteenth, fifteenth, eighteenth, nineteenth, and twentieth were struck.

obviously struck for other reasons.[34]  Defense counsel struck prospective juror Leishman for the explicit reason that Leishman believed that it was wrong for people other than police officers to carry guns.  Similar responses were obtained from prospective jurors Mackenrodt,[35] Fore, and Greany.  Prospective juror Martin stated that she believed in the "basic right that this country was founded on, that we should be able to protect ourselves," but "[i]n the ideal, I wish that nobody had a handgun."  She also expressed ambivalence about the appropriateness of defending oneself with a firearm.  Trial counsel challenged prospective juror Belcher for cause on the basis that he could not consider the punishment of life imprisonment for the murder of a police officer.  Prospective juror Hamilton knew the victim's wife because they went to the same church.  At one point, prospective juror Brenner expressed a view that, for capital murder, "death would be the proper penalty rather than life" and his feelings would probably be stronger if the victim were a police officer.  Prospective juror Hablitz's home had been burglarized, and trial counsel asked him only six questions.[36]

The record does not demonstrate a reasonable probability that, absent the complained-of statements by the prosecutor, the outcome would have been different.  Under the circumstances

---

[34]  Applicant now contends that Risinger should have been challenged for cause (see below).  Risinger gave the most extensive discussion of the meaning of probability (we have detailed only a small portion of it in this opinion), and that discussion was clearly in line with applicant's view of the term.

[35]  Trial counsel also challenged Mackenrodt for cause on the basis that he could not consider the full range of punishment for the lesser-included offense of murder, but after further examination by the prosecutor and the court, trial counsel withdrew the challenge.

[36]  Applicant used his last allotted peremptory challenge on Greany, whose examination immediately preceded Hablitz's, but applicant received an extra peremptory challenge that he used on Hablitz.  Applicant was forced to accept Williams, to whom he objected, who became juror number twelve.

presented, any possibility of harm is too speculative to meet the *Strickland* test.

### B. Failure to Challenge Risinger for Cause

In claim four, subsection four, applicant contends that trial counsel was ineffective for failing to challenge prospective juror Risinger for cause. Applicant claims that the record shows that Risinger would have automatically given a "yes" answer to the deliberateness special issue for anyone convicted of capital murder. Trial counsel states that he should have challenged Risinger for cause.

### 1. *No Deficient Performance*

Deficient performance has not been shown because the trial judge would not have erred in denying a challenge for cause. "A trial judge's ruling on a challenge for cause may be reversed only for a clear abuse of discretion."[37] Particular deference is accorded to a trial judge's decision when the prospective juror's answers are vacillating, unclear, or contradictory.[38]

Applicant points to testimony elicited by defense counsel from Risinger that suggests that he had some difficulty distinguishing between the mental states of "intentionally" and "deliberately":

Q. Does "intentionally" and "deliberately" mean the same to you, or do you think "deliberate" is a more conscious conduct, or what is your feeling on that?

A. I would think, before I came in here, that they meant the same thing. To me it means essentially the same thing.

Q. Essentially the same?

A. Yes.

---

[37] *Davis v. State*, 329 S.W.3d 798, 807 (Tex. Crim. App. 2010).

[38] *Id.*

* * *

Q. But what you are saying to me, then: That if you found someone guilty of capital murder and if the Prosecution stood up and said, "Your honor, we reoffer all the evidence which was heard at the guilt and innocence stage, and we rest," and they sat down, – And you have already found the person guilty beyond a reasonable doubt of capital murder. No doubt in your mind. – You would automatically answer the question number one (No. 1) "yes"?

A. Yes.

But the record also contains testimony from the prosecutor's earlier examination of Risinger that suggests that Risinger could follow the law and distinguish between "intentionally" and "deliberately":

Q. The significant question that I want to ask you is: By virtue of the fact that the words "deliberately" and "intentionally" are two different words, would the fact that you had found someone guilty of capital murder, acting intentionally, at the first phase of the trial cause you to automatically answer that Special Issue Number One (No. 1) "yes"; or would you take the facts, the evidence that you have heard, put it to the question as the law requires, and decide whether or not that evidence that you have heard proves the Special Issue Number One (No. 1) should be answered "yes"?

Am I making myself clear?

A. Yes.

The answer is "yes."

Q. You could do that?

A. Yes.

* * *

Q. But, will you go through the mental process, as the law requires, and see if that evidence proves beyond a reasonable doubt that the answer to that question should be "yes"? Will you do that?

A. Yes.

Risinger was a vacillating juror.[39]  Because the trial court would not have erred in denying

a challenge for cause, counsel was not ineffective for failing to raise such a challenge.

### 2. *No Prejudice*

Applicant received an extra peremptory challenge at trial.  In order for a defendant who

receives one extra peremptory strike to demonstrate harm, he must show that the trial court

erroneously denied two challenges for cause.[40]  On direct appeal, we declined to address applicant's

point of error regarding his challenge for cause against prospective juror Belcher because the extra

peremptory strike would have cured any error in denying the challenge.[41]  Now we conclude that the

trial court did not in fact err in denying applicant's challenge to Belcher.

On direct appeal, applicant contended that Belcher was biased against life imprisonment for

capital murder.  During a colloquy with trial counsel, Belcher indicated that he could not consider

life imprisonment for the murder of a police officer:

> Q. And I want to know how you feel.  If you believe, after serving on a jury, that you believe that beyond a reasonable doubt that a person intentionally and knowingly killed a police officer, knowing he was a police officer, could you ever consider "life"?
>
> A. I don't believe.
>
> Q. Pardon?
>
> A. I do not believe I could.

---

[39]  Any confusion suffered by Risinger is understandable given that at least one important question from each side was long-winded.

[40]  *Sells v. State*, 121 S.W.3d 748, 758 (Tex. Crim. App. 2003).

[41]  *Williams*, 682 S.W.2d at 543.

> Q. So you are theoretically saying: Where you have found someone guilty of capital murder for shooting a police officer, you don't think, if the evidence warranted it, and the – excuse me for kind of – I'm not talking real well –
>
> So you do not think "life imprisonment" would be a proper punishment in a capital murder case if a police officer was killed?
>
> A. No.

Trial counsel then challenged Belcher for cause.

The trial judge then asked Belcher if he could set aside his views, and Belcher replied that he could:

> Q. Sir, would that feeling, attitude or condition of mind affect the manner in which you considered any issue of fact, more especially the issues relating to the questions asked on the punishment phase?
>
> My question is really asking whether you can set that attitude aside and answer those questions based on the evidence.
>
> A. Yes, I could.

After hearing this answer, the trial judge denied the challenge for cause.

A juror is not challengeable for cause if he can set aside his personal views and follow the law.[42] Because Belcher said that he could set aside his personal views and answer the special issues on the basis of the evidence, he was not challengeable for cause. So, even if Risinger had been challengeable for cause, the fact that Belcher was not challengeable for cause means that applicant's extra peremptory strike would be available to cure any harm in connection with Risinger.

## IV. GUILT (I.A.C.)

### A. Presenting Defense Witnesses

---

[42] *Davis*, 329 S.W.3d at 810.

In claim eleven, subsection six, applicant argues that trial counsel performed deficiently when he called defense witnesses Valerie Sudduth and Howard Russell at the guilt stage of trial. Applicant contends that trial counsel should have rested the defense case immediately after the State rested. He contends that he would have been entitled to an acquittal of the capital-murder charge on appeal because the State had presented legally insufficient evidence in its case-in-chief to show that applicant knew that the victim was a police officer. Applicant further argues that the defense witnesses supplied some evidence in that regard. Moreover, applicant contends that Sudduth's and Russell's testimony impeached applicant's own testimony on several points and eliminated an appellate claim that the trial court erred in allowing the State to impeach Angelia Lewis. Trial counsel agrees that he should have rested behind the State. He further states that he called Sudduth and Russell without knowing the content of their prior written statements, because the State would not allow him to see them, and that he should have recognized that the witnesses were subject to significant impeachment.

Applicant argues that Lewis's testimony was the only evidence in the State's case-in-chief that was relevant to whether applicant knew that Detective Shirley was a police officer. Lewis testified during the State's case-in-chief that applicant came to her apartment that day with blood on his arms. He cleaned himself up, changed shirts, cut off his jeans, and clipped off some of his beard. Applicant told her that he shot a person who was trying to rob him. He said that he saw something shining on the ground after he shot the man, but he did not believe the man was a police officer because the man's gun was not a revolver. Applicant also told her that he had been robbed in the past by someone who falsely identified himself as a police officer.

In prior statements to the Houston police and at an examining trial, Lewis said that applicant told her that Detective Shirley had said, "Arthur Williams, Houston police, halt," and shown him a badge. But at trial, Lewis denied that applicant said that to her. Because of Lewis's denial at trial, her written statements to the police and her examining trial testimony were admitted for impeachment purposes. Because those statements were not admitted as substantive evidence, applicant reasons, there was no substantive evidence that he knew that Detective Shirley was a police officer.

But, applicant further argues, the defense witnesses supplied such evidence. Sudduth testified that applicant told her that, during the struggle with Detective Shirley, another man approached, and Detective Shirley said, "I am a police officer. I need help." Sudduth also testified that applicant, after watching television news coverage of the incident, said, "Oh it really was a policeman." Russell testified that applicant said that, some time during the struggle, Detective Shirley dropped his wallet and Russell guessed "there might have been a badge laying there." Russell further testified that applicant did not say at what point in the struggle the badge fell out. Nevertheless, both Sudduth and Russell testified consistent with the defense theory that, if Detective Shirley identified himself as a police officer, applicant did not believe him.

We disagree with applicant's contention that the evidence presented in the State's case-in-chief was legally insufficient. Dennis Knight testified for the State about the following conversation that he heard from the balcony of his apartment:

WHITE MAN'S VOICE: Turn around and get up against the wall.

BLACK MAN'S VOICE: I am turning around, mother fucker. Caroline,[43] call somebody. Caroline, call somebody.

WHITE MAN'S VOICE: I said, up against the wall.

BLACK MAN'S VOICE: You got no business fucking with me. You ain't got nothing on me.

Knight went to the breezeway where the voices were coming from, and he saw a white man holding a black man against the wall, with the two of them struggling over a metal object. Upon noticing Knight, the white man said, "Call the police, this man is trying to shoot me." Knight went back to his apartment to call the police, and during the call he heard gunshots. When he returned to the breezeway, the two men were gone, but on the breezeway floor were various items, including a police badge that was face down.

The language used by Detective Shirley is typical of what police would say, and the "you ain't got nothing on me" language is what one might expect an absconder to say to an officer. These facts, along with the badge, are sufficient evidence from which a rational jury could conclude that applicant knew Detective Shirley was an officer. But there is more: the fact that Detective Shirley asked Knight to call the police would also have shown applicant that he was not being robbed, as he contends he believed.

There was also testimony from John Carroll that, after hearing gunshots, he went to the breezeway and saw a police badge on the floor. And a rational jury could believe that applicant talked with Lewis about being a victim of a prior robbery because he was claiming that he thought

---

[43] Other evidence at trial suggests that applicant may have actually said "Claudette," the name of his girlfriend.

Detective Shirley had done the same thing: falsely identified himself as a police officer. We find that the evidence presented during the State's case-in-chief was legally sufficient to support the conviction, and therefore, we reject the premise of applicant's argument that trial counsel was ineffective for failing to rest behind the State.

And although trial counsel says that he should have known that Sudduth and Russell were subject to significant impeachment, he does not explain how he should have known that, since the State withheld the written witness statements until trial, as they were entitled to do. Moreover, the State's evidence provided a rather persuasive inference that Detective Shirley did indeed identify himself as a police officer. A reasonable attorney would have realized that applicant's own self-serving testimony probably would not be enough to rebut the State's evidence in the minds of the jurors, and Lewis's testimony had been thoroughly impeached. As for preserving an issue with respect to the State impeaching Lewis (because she was the State's own witness), the trial court believed that the State had satisfied the surprise and injury requirements needed to allow such impeachment,[44] and trial counsel was not ineffective for declining to place his client's fate entirely in the hands of an appellate court.

## B. Prosecutor's Closing Argument

In claim eleven, subsection sixteen, applicant contends that trial counsel was ineffective for failing to object to comments made by the prosecutor in closing argument. Specifically, applicant contends that the prosecutor argued outside the record when he suggested that applicant was in fact

---

[44] *See Hughes v. State*, 4 S.W.3d 1, 4-5 (Tex. Crim. App. 1999) (discussing the "voucher" rule that predated the modern rules of evidence).

the robber, not the victim, in the prior robbery incident applicant had described. Applicant claims that the prosecutor's argument was a reference to an incident that the prosecutor had learned about that occurred between applicant and Donald Chaline on February 9, 1982. Chaline had told the police that a black man had shot him during a robbery. But Chaline was never called to testify about the incident. Trial counsel says that he "should have objected to the prosecutor's argument that applicant had tried to rob Donald Chaline and then claimed that he was the victim."

At trial, applicant testified that, on February 9, 1982, a person who identified himself as "Donald Smith" came to the door of applicant's home, flashed a badge, pointed a pistol at him, and told him to "spread eagle on the ground." According to applicant, this person identified himself as a police officer and pulled out some handcuffs. A struggle ensued, during which applicant's assailant was shot by his own weapon. Applicant claimed that he then took the assailant's pistol, ascertained that the badge was fake, wrapped up the assailant's bleeding arm, and forced the assailant to leave. Applicant testified that he called his sister but did not call the police because he was in violation of his parole.

In closing argument, defense counsel talked about the mistake-of-fact instruction in the jury charge. He told the jury that if it believed that Detective Shirley identified himself as a police officer, it could still acquit applicant of capital murder if it believed that applicant mistakenly thought that Detective Shirley was not in fact a police officer due in part to applicant's prior experience of being robbed by someone who impersonated a police officer.

In closing argument, the prosecutor responded to applicant's prior-robbery story with disbelief, saying that, if the incident happened at all, applicant was probably the robber rather than

the victim:

> How about this alleged prior robbery. I suggest to you that you weren't born yesterday. That you have got to have a story of some kind if you are a defendant up here, that you have had since April 28, 1982, to think about what you are going to tell this jury. That you can't just agree with what the State says. You have got to go and listen to what the other witnesses are going to say and you have to tell them, even if they are your witnesses, that they must be lying because you didn't say anything like that. That is what you have to do. That is what the defendant has to do.

> Well, he would like for you to believe that he had some robbery committed on him. Isn't that ironic, that he would have a robbery committed on him sometime in the past? There is absolutely no – zero – physical evidence at all to show that that might have happened. He may have tried to rob somebody and then he wants to come back and tell his law-abiding friends that person got hurt, that if in fact they were trying to rob him. Certainly he wouldn't come back and tell somebody that he had done a robbery. He would like to have these folks as friends.

> So, he would like for you to believe that somebody comes to his door, put a badge on him, identifies himself as a police officer, tries to handcuff him and then the fight is on. That that person got shot. And then the defendant, for some reason, gathers up the badge, gathers up the handcuffs and, just conveniently enough, gives them all back to this person that he said tried to rob him and sends him on his way.

> And it just so happened that they didn't call the police. It just so happened that his sister said the defendant said something to her about it and she doesn't call the police. She don't call the police because, if you believe the defendant, he has a gun. You don't call the police because you know that the defendant is on the run as a parole violator.

> And it is also very convenient that the defendant happens to be alone when he says all this happened.

> And they stick out a picture to the defendant and say, "Is this the person that robbed you?" I suggest to you, that to sell that story, if that was Mickey Mouse on that picture, he is going to say that is the person that robbed me. He is going to say that about anybody. You have got to do something to make the story believable because there is no physical evidence or anything else to make you believe that.

> And again, isn't it ironic that the defendant, who has been convicted of aggravated robbery, claims somebody robbed him? That is ironic. I think that makes his story more unbelievable.

But, the prosecutor continued, even if the jury believed that applicant told the truth about being a

robbery victim, such an incident could not excuse applicant's conduct of killing Detective Shirley:

> Let's say, just for example sake, that you believe the defendant for a moment, that you believe that he would tell you the truth, even though I have showed you that I don't think he is credible, that you believe further that there is some sort of robbery as the defendant had described in the past. Should that show that the defendant is not guilty in this case? Should the defendant be able to say, put a story on you that he has about this person saying that he was a police officer, should that give him the right any time hereafter, that when somebody tries to arrest him, to blow that police officer away? Because, I suggest to you, if you believe that story, then the defendant has that from now on. Any time he is confronted by the police department when they are not in uniform, that is going to be his defense. And that is just not right.

"Proper jury argument generally will fall within one of four categories: 1) summary of

evidence; 2) reasonable deduction from the evidence; 3) response to argument of opposing counsel;

and 4) plea for law enforcement."[45] Conversely, it is improper for a party to refer "to facts that were

neither in evidence nor inferable from the evidence."[46] According to his own testimony, on February

9, 1982, applicant shot a person and took his gun. From those facts, a rational jury could infer that

applicant committed aggravated robbery.[47] Applicant's testimony suggested that his acts were

justified under the doctrine of self-defense,[48] but the jury was not required to believe that portion of

his testimony.[49] The prosecutor's argument that, if the incident occurred, applicant was likely the

---

[45] *Ex parte Lane*, 303 S.W.3d 702, 711 (Tex. Crim. App. 2009).

[46] *Id.*

[47] *Sorrells v. State*, 343 S.W.3d 152, 157-58 (Tex. Crim. App. 2011); TEX. PENAL CODE §§ 29.02, 29.03.

[48] *See* TEX. PENAL CODE §§ 9.31, 9.32.

[49] *Sorto v. State*, 173 S.W.3d 469, 475 (Tex. Crim. App. 2005) ("However, the jury was free
(continued...)

robber, was a reasonable deduction from the evidence. That the prosecutor possessed, but did not introduce, additional evidence to substantiate that reasonable deduction does not negate the reasonableness of the deduction itself. Contrary to the implication in trial counsel's affidavit, the prosecutor did not mention Chaline or claim that an individual had in fact made an assault or robbery report to the police. The prosecutor had every right to respond to the story that applicant himself introduced about being the victim of a robbery, and to respond to defense counsel's closing argument, which claimed that the alleged prior robbery supported a mistake-of-fact defense. Trial counsel was not ineffective because the prosecutor's argument was permissible.

Moreover, even if the prosecutor's comment were an improper reference to evidence that was outside the record, applicant suffered no prejudice. The point of the prosecutor's argument as a whole was not that applicant was a bad person because he committed a prior robbery. Rather, the prosecutor was making the point that the jury should not believe applicant's testimony that he was robbed by an individual impersonating a police officer, and even if it did so believe, that did not mean that applicant was unaware of the fact that Detective Shirley was a police officer. Those were legitimate points to make. And the jury already knew that applicant was a parole violator on an aggravated-robbery conviction, so it already had plenty of evidence that he was a criminal by being not only a robber, but an absconder.

## V. PUNISHMENT (I.A.C.)

### A. Failure to Present Mitigating Evidence

---

(...continued)
to take all of the evidence into account and to believe or disbelieve any portion of [the defendant's] statements.").

In claim thirteen, subsection one, applicant contends that trial counsel was ineffective for failing to investigate and present punishment evidence. Applicant takes trial counsel to task for resting behind the State at the punishment stage. Applicant argues that trial counsel could have called applicant's mother, Joyce Williams, and his sister, Deborah Williams, to testify about his positive attributes and to ask the jury to spare his life. He contends that counsel failed to do so out of a "defeatist mentality" rather than a trial strategy. He contends that evidence could have been introduced that he was in Boy Scouts, played sports, obtained a GED at age eighteen, and took college courses while in prison (in Minnesota). He also contends that the jury could have heard evidence that he loved animals, was an avid reader, was adept at computers, wrote poetry, and was interested in crafts, photography, calligraphy, art, music, and dancing. He also contends that the jury would have found that he was a devoted son and brother who cared deeply about family. Finally, applicant contends that evidence could have been introduced that he had a troubled childhood: his parents were divorced before he was born, he was raised for the most part by a single mother, his father was an alcoholic who was in and out of jail and would occasionally stay home and beat his mother, applicant was beaten and bullied by older teenagers and exposed to illicit drugs, and applicant abused alcohol and drugs.

In his affidavit, trial counsel states, "Before trial, I spent all of my time preparing for the guilt stage and did not pay any attention to the punishment stage. Accordingly, I did not determine whether there was any mitigating evidence to present."

At the time of applicant's trial, there was no such thing as a broad-based mitigation special

issue, such as we have today.[50]   The three special issues submitted in applicant's trial were deliberateness,[51] future dangerousness,[52] and provocation.[53]   Although the Supreme Court had suggested in the abstract that a jury ought to be permitted to broadly consider the characteristics of the individual offender in determining whether the death penalty was appropriate,[54] the Court had specifically upheld the constitutionality of the Texas death-penalty scheme in *Jurek v. Texas*.[55] Given the Supreme Court's holding in *Jurek*, trial counsel could not have reasonably expected to obtain the kind of mitigation special issue that we now take for granted.  In formulating his defense of applicant, counsel was limited to the special issues that were submitted.

It would not be accurate to say that the defense had a good case on the deliberateness and provocation issues, but it would be accurate to say that he had a better case on these issues than most capital-murder defendants.  Applicant had not planned to kill someone that day.  He had not even

---

[50]   *See* TEX. CODE CRIM. PROC. art. 37.0711(e) ("Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.").  *See also Penry v. Lynaugh*, 492 U.S. 302 (1989) ("*Penry I*").

[51]   TEX. CODE CRIM. PROC. art. 37.071(b)(1) (West 1983) ("whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result").

[52]   *Id.*, art. 37.071(b)(2) ("whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society").

[53]   *Id.*, art. 37.071(b)(3) ("whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased").

[54]   *Eddings v. Oklahoma*, 455 U.S. 104, 110-12 (1982); *Lockett v. Ohio*, 438 U.S. 586, 605 (1978).

[55]   428 U.S. 262 (1976).

planned a robbery during which he might have anticipated the death of an individual. Applicant

killed his victim during a struggle, and while there was certainly enough time for him to have formed

a "deliberate" mental state, applicant at least had room to argue that his conduct was not deliberate.

Likewise, applicant was in a better position on the provocation special issue than most capital-

murder defendants. For some capital-murder defendants, such as those who sexually assault and

murder children,[56] even mentioning the provocation issue would be likely to alienate the jury. But

applicant's victim was an armed adult who had initiated the encounter. Even in cases where a police

officer is killed, provocation would not be as viable an issue if the defendant initiated an encounter

instead of the officer.[57]

Applicant's evidence on the deliberateness and provocation special issues necessarily came

in during the guilt stage of trial. And some evidence of his good character, relevant to future

dangerousness, had also been presented at the guilt stage: his GED and his college credits while

incarcerated in Minnesota. In addition, the guilt-stage evidence included testimony that applicant

was shaken and distraught after the shooting,[58] that he was apologetic,[59] and that he was twenty-two

---

[56] *See e.g.*, *Lane v. State*, 933 S.W.2d 504 (Tex. Crim. App. 1996); *Nenno v. State*, 970 S.W.2d 549 (Tex. Crim. App. 1998).

[57] *See Freeman v. State*, 340 S.W.3d 717, 722 (after defendant's vehicle had become disabled during a chase, he exited the vehicle and began firing at the officers); *Mays v. State*, 318 S.W.3d 368, 373-75 (Tex. Crim. App. 2010) (after officer started reading *Miranda* warnings, defendant rushed away, retrieved firearm, and eventually shot two officers during a standoff).

[58] Sudduth testified that applicant was "crying uncontrollably" after the incident.

[59] Linda Ransome, one of applicant's sisters, testified that, after the incident, applicant kept saying, "I'm sorry; I'm sorry; I'm sorry." The State's objection to the relevance of the testimony was sustained, though no instruction to disregard was given.

years old at the time of the offense.

All of this evidence supported the notion that applicant's conduct was an aberration. Applicant's narrative was that he had made mistakes but had also made efforts to improve himself and that the killing was a spur-of-the-moment reaction to stressful circumstances that were at least somewhat the fault of the arresting officer. This narrative supported applicant's position on the three punishment special issues that were submitted to the jury: If the killing occurred during the heat of the moment, it could be argued that it was not deliberate. If applicant's conduct was an aberration and he was trying to improve himself, then perhaps he was not a future danger. If the killing was a response to questionable conduct engaged in by the plain-clothes police officer, it might be considered reasonable as a response to provocation from the victim.

The evidence that applicant thinks counsel should have discovered can be lumped into two broad categories: (1) blame-lessening evidence—showing that the reason that applicant is a bad person is that bad things have happened to him, making him less blameworthy, and (2) good-person evidence—showing that applicant's character is good, either from opinion testimony or because of the good things he has done. The first category of evidence would undermine applicant's position on the special issues. If applicant is a bad person (because of the bad things have happened to him), then he is more likely to be a future danger, his conduct was more likely to have been deliberate, and his conduct was not as likely to have been a reasonable response to provocation from the deceased. The more blame-lessening evidence one introduces, the stronger these inferences become.[60] Blame-

---

[60] If drug abuse were shown to be related to the crime, it could perhaps be argued as mitigating on the issue of future dangerousness on the theory that the drug abuser could receive

(continued...)

lessening evidence would be relevant under a general mitigation special issue, such as the one that is now submitted in capital-murder cases. But given that no general mitigation special issue existed at the time of applicant's trial, and there was no reason to think that counsel could obtain the submission of such an issue, there was no reason to search for evidence relevant to such an issue. That type of evidence would undermine applicant's case on the issues that were actually to be submitted.

As for good-person evidence, defense counsel had already offered some of that type of evidence during the guilt stage of trial: the GED, college credits, applicant being distraught and apologetic about the incident, and applicant's youth. Applicant now faults counsel for failing to introduce testimony about applicant's good character from family members. But evidence from family members might not be considered especially credible or weighty by the jury, and it could be double-edged because some of the testimony at the guilt stage showed at least one family member (applicant's sister Ransome) assisted applicant in his efforts to avoid apprehension and punishment.[61] And the jury was unlikely to be impressed by the fact that applicant had a lot of hobbies.

Although trial counsel now suggests that he should have done an investigation specifically geared toward punishment, we find it understandable that a defense attorney in trial counsel's

---

(...continued)
treatment, but such evidence would still conflict with applicant's position on provocation. And drug abuse could easily be seen as aggravating on future dangerousness as well. *See Ex parte Smith*, 309 S.W.3d 53, 62 (Tex. Crim. App. 2010).

[61] Ransome allowed applicant to stay at her apartment even though she knew that he had jumped his parole. After the instant offense, she falsely told the police that he did not live at her place. She also testified, "No," when asked if she would testify to anything that would hurt her brother or cause him to get the death penalty.

situation would have a guilt-focused strategy. Given the death-penalty scheme at the time and the facts of applicant's case, even the punishment issues revolved around the guilt-stage evidence. Introducing more evidence at the punishment stage could have hurt, rather than helped, applicant's position on the special issues.

But even if we assume that counsel performed deficiently by failing to conduct an investigation with respect to the punishment issues,[62] we conclude that applicant has failed to show prejudice. We emphasize that, even if counsel were ineffective for failing to conduct an investigation, he was not ineffective for failing to request a general mitigation special issue.[63] We

---

[62] *See Ex parte Napper*, 322 S.W.3d 202, 246 (Tex. Crim. App. 2010) ("When trial counsel does not conduct a complete investigation, his conduct is 'reasonable only to the extent that reasonable professional judgments support the limitations on investigation.'") (quoting *Wiggins v. Smith*, 539 U.S. 510, 533 (2003)).

[63] The dissent contends that though "counsel may not be faulted for failing to request what we now refer to as a 'mitigation special issue,'" he should have requested some type of instruction that would enable the jury to give effect to mitigating evidence that was beyond the scope of the statutory punishment issues. We disagree. As we explained above, the Supreme Court had upheld the Texas sentencing scheme in *Jurek*. That sentencing scheme did not authorize any sort of instruction for mitigating evidence that was beyond the scope of the statutory issues. Defense counsel had no reason to believe that a trial court would grant an instruction that was neither authorized by statute nor required by court precedent. *See Powell v. State*, 897 S.W.2d 307, 314-17 (Tex. Crim. App. 1994) (jury charge on death-penalty punishment issues may not deviate from the statutory scheme), *overruled in part by Prystash v. State*, 3 S.W.3d 522 (Tex. Crim. App. 1999) (party can be estopped from complaining about unauthorized submission that he procured); *Eads v. State*, 598 S.W.2d 304, 306-07 (Tex. Crim. App. 1980) (trial court erred in not obtaining jury's answers to all of the special issues submitted).

The dissent contends that *Jurek* did not foreclose the possibility of an as-applied challenge to the Texas scheme and that the Supreme Court's decision in *Lockett* should have alerted defense counsel to the need to request some sort of mitigation instruction. But in *Lockett*, the Supreme Court referred favorably to the Texas death penalty scheme, contrasting it with the Ohio statute that it would hold unconstitutional. 438 U.S. at 606-07. And in *Adams v. State*, we distinguished *Lockett*
(continued...)

(...continued)

as inapplicable to the Texas scheme and held that the Eighth Amendment permitted the legislature to guide a jury's discretion with respect to mitigating evidence. 577 S.W.2d 717, 729-30 (Tex. Crim. App. 1979), *rev'd on other grounds*, *Adams v. Texas*, 448 U.S. 38 (1980). Further, we explicitly rejected the notion that the death-penalty scheme could be unconstitutional if "the jury is convinced by the evidence beyond a reasonable doubt that the punishment issues should be answered affirmatively. . . . even though the jury, on the basis of the mitigating evidence, may believe that death is inappropriate." *Id.* at 729. In other *pre-Penry I* cases, we rejected defendants' arguments for supplementing the charge to ensure that the jury considers all possible mitigating circumstances. *Quinones v. State*, 592 S.W.2d 933, 947 (Tex. Crim. App. 1980); *Lackey v. State*, 638 S.W.2d 439, 455 (Tex. Crim. App. 1982).

Moreover, the only way that we see to effectuate the dissent's suggestion of submitting a "mitigation instruction" that is *not* a special issue would be to submit a nullification instruction that would allow the jurors to change their answer to an existing special issue based upon evidence that was not relevant to that special issue. *See Penry v. Johnson*, 532 U.S. 782, 798 (2001) ("*Penry II*") (If supplemental mitigation instruction was viewed as simply "telling the jurors to take [the defendant's] mitigating evidence into account in determining their truthful answers to each special issue" then it "placed the jury in no better position than was the jury in *Penry I*."). In *Penry II*, the Supreme Court held that such a nullification procedure was "internally contradictory, and placed law-abiding jurors in an impossible situation." *Id.* at 799. We cannot conclude that an instruction that renders the jury charge "internally contradictory" and places law-abiding jurors in an "impossible situation" is the type of instruction that a reasonable attorney was required to request.

As alternatives to a nullification instruction, the dissent contends that the trial court could have submitted a definition of "deliberately" that encompassed the defendant's mitigating evidence or submitted a "catch-all" instruction. But defining "deliberately" in such a way would require giving it a meaning contrary to its common meaning and the law. The term "deliberately" is "in common parlance" a "thought process." *Andrews v. State*, 744 S.W.2d 40, 40-41 (Tex. Crim. App. 1987). A defendant's bad childhood has nothing to do with this common meaning of "deliberately." And while remorse experienced by a defendant *after* the crime is a thought process, the deliberateness special issue focuses on the defendant's thought process at the time the crime was committed, not after the crime was committed.

As for including a catch-all instruction, we do not see how such an instruction differs from a special issue or a nullification instruction. For a catch-all instruction to be meaningful under *Penry II*, the instruction must relate to a verdict-form response from the jury. A catch-all verdict-form response that is outside the statutory special issues would itself be a special issue, which the dissent has already conceded defense counsel was not deficient for failing to request. A catch-all instruction

(continued...)

must therefore analyze prejudice with respect to the special issues that were actually submitted to the jury.[64]

The aggravating evidence against applicant was substantial. Applicant killed Detective Shirley by shooting him not just once, but twice. Before the present offense, applicant had been convicted of two aggravated robberies, criminal damage to property, and attempted escape. And he had absconded to Texas from his parole in Minnesota. While in Texas, he used a false name to hide his identity. Eight people associated with the criminal justice system in Minnesota—from six different cities[65]—testified that applicant's reputation for being a peaceful and law-abiding citizen

---

(...continued)
which related only to the statutory special issues would have to instruct the jury to answer "no" to the special issues based on evidence satisfying the catch-all instruction even though such evidence would not logically be mitigating within the context of the special issues—the very definition of a nullification instruction.

[64] The dissent analyzes prejudice with respect to the mitigating-evidence investigation by looking at the mitigating value of certain evidence that was beyond the scope of the special issues submitted at applicant's trial (e.g. abusive family environment lessening applicant's moral culpability). This type of analysis is flawed because it depends entirely upon the erroneous notion that counsel was ineffective for failing to request some sort of nonstatutory mitigating-evidence instruction. *See* this opinion *ante*. For this reason, the dissent's reliance on *Porter v. McCollum*, 130 S. Ct. 447 (2009), *Williams v. Taylor*, 529 U.S. 362 (2000), and *Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010), is misplaced. All three of those cases were decided under schemes that allowed the finder of fact to consider any type of mitigating evidence. *See Lambrix v. Singletary*, 520 U.S. 518, 521 (1997) (observing that Florida was a "weighing state" in which specified aggravating circumstances are weighed against any mitigating circumstances at the sentencing phase of a capital trial"); *Porter*, 130 S. Ct. at 453-54 (Florida prosecution); *Williams v. Warden*, 254 Va. 16, 19, 487 S.E.2d 194, 195 (1997) (punishment hearing involved future dangerousness aggravating factor and consideration of mitigating evidence), *result overturned by*, *Williams v. Taylor*, *supra*; *Coble*, 330 S.W.3d at 205 (statutory mitigation special issue).

[65] Minneapolis, Red Wing, Plymouth, Golden Valley, St. Paul, and Wilmington.

was bad. In yet another Minnesota city,[66] applicant was found in possession of a .22 semi-automatic rifle with a scope, a .357 handgun, a concealed gun holster, a speed loader, and .357 hollow-point bullets. The bullets were found in applicant's pocket, a box, the handgun, and the speed loader. All of this evidence strongly indicated that applicant posed a future danger to society.

As we explained above, blame-lessening evidence would have done little or nothing to overcome this aggravating evidence, but would have simply added ammunition to the State's case. The evidence of applicant's childhood troubles was weak, but to the extent it had any effect at all, it would be to strengthen the State's case on the three submitted special issues. And because no evidence was introduced that applicant's crime was committed under the influence of alcohol or drugs, evidence of alcohol and drug abuse—which could in the abstract be considered aggravating or mitigating[67]—was unlikely to favorably influence the jury's decision-making.

The most significant evidence of positive character traits—applicant's attempts to better himself by obtaining a GED and taking college courses—was introduced at his trial. "[S]ince the jury was privy to some" of applicant's mitigating evidence, the question is whether applicant has carried his burden to show that there is "a reasonable probability that the unadmitted alleged mitigating evidence would have tipped the scale in applicant's favor."[68] As we observed earlier, the jury was unlikely to be impressed by the fact that applicant had a lot of hobbies. Testimony from applicant's family members would likely have been greeted by the jury with skepticism, and it could

---

[66] Edina.

[67] *Smith*, 309 S.W.3d at 62.

[68] *Ex parte Martinez*, 195 S.W.3d 713, 731 (Tex. Crim. App. 2006).

have backfired, as the jury could have believed that applicant's family might assist applicant in efforts to avoid apprehension or punishment. We conclude that applicant has not shown a reasonable probability that the unadmitted evidence would have tipped the scale in his favor on the punishment special issues.

## B. Trial Counsel's Closing Argument

In claim thirteen, subsection two, applicant contends that trial counsel performed deficiently when he argued that the jury should consider Detective Shirley's widow when assessing punishment. During argument, trial counsel stated:

> I am somewhat at a loss for words to come to you all. I think the evidence the State has given you, I think they are going to make probably some very strong arguments to you, to consider the wife of Detective Shirley. I think you probably should. I think you did at the guilt or innocence. But now you are to determine, based upon the evidence, the questions and how are you going to answer the three special issues.

Trial counsel states that he should not have made that argument, but he also says that he "anticipated that the prosecutor would argue about the loss to Shirley's family," and he "tried to preempt that argument to some extent by making it first." In retrospect, trial counsel says, he made a mistake because a "victim impact" argument was improper, outside the record, and irrelevant to the special issues.

We disagree with trial counsel's assessment that his performance was deficient. We have explained that "a defendant who kills a stranger . . . could and should anticipate that other people may mourn the victim's passing. Those things are a matter of common knowledge, which a

prosecutor could argue to the jury without the support of any evidence in the record."[69] Such an argument can be made in connection with the future-dangerousness special issue.[70] Though it might have been mildly improper for the prosecutor to make a specific reference to Detective Shirley's wife, he could have legitimately argued that applicant understood or should have understood that Detective Shirley likely had family that would mourn his passing. While defense counsel's argument specifically mentioned Detective Shirley's wife, it gave no information about the effect of the murder on her. We conclude that defense counsel's argument was a legitimate effort to deflate the significance of an argument that the prosecutor would have been allowed to make.

Moreover, applicant's case was tried before the use of "victim impact" evidence had become an issue in the courts. The first Supreme Court case finding the improper use of victim-impact evidence was decided in 1987,[71] and we first addressed a complaint relating to victim-impact evidence in 1989.[72] Trial counsel cannot be faulted for failing to perceive an issue that was not yet being raised in the courts.

## VI. ABSENCE OF MITIGATION ISSUE

In claim fifteen, applicant complains that the jury was not given an adequate vehicle "to

---

[69] *Williams v. State*, 273 S.W.3d 200, 220 (Tex. Crim. App. 2008).

[70] *Id.*

[71] *Booth v. Maryland*, 482 U.S. 496 (1987), *overruled by Payne v. Tennessee*, 501 U.S. 808 (1991).

[72] *Washington v. State*, 771 S.W.2d 537, 539-41 (Tex. Crim. App. 1989).

consider and give effect to the mitigating circumstances surrounding the offense."[73]  Because applicant's case was tried before *Penry I* was handed down, the absence of an objection will not prejudice our evaluation of his claim.[74]  For us to conclude that a death-sentenced individual was denied his constitutional right to a vehicle for considering his mitigating evidence, the record must demonstrate that the mitigating evidence had meaningful relevance to the defendant's moral culpability that "was either outside the scope of the special issues, or had an aggravating potential when considered within the scope of the special issues."[75]

We see nothing in the circumstances of the offense that has meaningful mitigating relevance to applicant's moral culpability.  In delivering a verdict of guilt and answers to the special issues, the jury determined that applicant knew that Detective Shirley was a police officer and that applicant's behavior was not reasonable in response to any provocation from him.  A person's murder of a police officer is not any less blameworthy because the police officer happens to be trying to lawfully arrest him.  And the previous incident in which applicant was allegedly robbed by someone who pretended to be a police officer does not make applicant less blameworthy when he knew that Detective Shirley was in fact a police officer.  That applicant was upset and apologetic after the incident could be relevant to show that he was remorseful, which can impact a jury's determination of future dangerousness, but applicant's reaction after the incident does not make him

---

[73]  This is the explanation of applicant's claim in the argument section of his brief.  Applicant states his claim as: "Article 37.071 of the Code of Criminal Procedure is unconstitutional as applied to applicant because it required a mandatory death sentence if the jury answered the special issues in the affirmative even if the jury believed that applicant did not deserve to die."

[74]  *Ex parte Hathorn*, 296 S.W.3d 570, 572, 573-74 (Tex. Crim. App. 2009).

[75]  *Ex parte Smith*, 309 S.W.3d 53, 60 (Tex. Crim. App. 2010).

less blameworthy for what occurred.[76]  Likewise, applicant's attempts to better himself through education was relevant to future dangerousness but did not impact his moral culpability.  In the habeas proceedings, applicant presented some evidence of a troubled childhood, but this evidence was not presented at trial, and so cannot be considered in determining whether he should have obtained a mitigation special issue.

Finding that none of applicant's allegations have merit, we deny relief on the trial court's findings, except where such findings may conflict with this opinion.

Delivered: June 13, 2012
Do not publish

---

[76] The dissent contends that evidence of remorse requires a separate mitigation special issue. Remorse can be mitigating because it shows that the defendant has changed—which is a core issue in the future-dangerousness inquiry.  And a jury could have believed that applicant's distress was caused by remorse rather than by fear for himself.  But it is not apparent how any such remorse could have mitigating impact beyond its relevance to the future-dangerousness issue, and the dissent does not explain how it could.

Moreover, the evidence of applicant's distress after the killing was introduced in an effort to persuade the jury that he was unaware, at the time of the killing, that his victim was an officer. The jury rejected that proposition when it found him guilty of capital murder.  It seems unlikely that the jury would find mitigation value in evidence it had already rejected.